JACQUELINE MICHAUD *v.* JAMES WAWRUCK ET AL.
(13482)

PETERS, C. J., HEALEY, SHEA, CALLAHAN and GLASS, Js.

Argued November 3—decision released December 20, 1988

*David R. Kritzman,* with whom, on the brief, was *Michael M. Darby,* for the appellant (plaintiff).

*J. Patrick Dwyer,* with whom, on the brief, was *Timothy J. Fitzgerald,* for the appellees (defendants).

PETERS, C. J. The sole issue in this case is whether a written visitation agreement between a genetic mother and adoptive parents violates the public policy of this state. The plaintiff, Jacqueline Michaud, filed a complaint seeking specific enforcement of an "Open Adoption and Visitation Agreement" between herself and the defendants, James Wawruck and Cynthia Wawruck. The defendants filed a motion to strike the complaint, which was granted by the trial court, *Barall, J.,* and was the basis for the subsequent rendering of a judgment in favor of the defendants by the trial court, *Kaplan, J.* The plaintiff's appeal to the Appellate Court has been transferred to this court pursuant to Practice Book § 4023. We find error and remand the case for further proceedings.

Since this appeal is from a judgment following the granting of a motion to strike, we must take the facts to be those alleged in the plaintiff's complaint and construe the complaint in the manner most favorable to sustaining its legal sufficiency. *Blancato* v. *Feldspar Corporation,* 203 Conn. 34, 36, 522 A.2d 1235 (1987); *Norwich* v. *Silverberg,* 200 Conn. 367, 370, 511 A.2d 336 (1986). Accordingly, we assume the following factual circumstances concerning the "Open Adoption and Visitation Agreement" negotiated by the parties. The Ellington Probate Court, on August 31, 1981, terminated the plaintiff's parental rights with respect to her child born on February 5, 1979. The same Probate Court terminated the father's parental rights on January 6, 1982. At some time thereafter, in 1982, the plaintiff filed a Superior Court action against the commissioner of children and youth services to set aside the Probate Court's decree terminating her parental rights, on the ground that her consent to that proceeding had been

fraudulently procured by the child's father. The child's foster parents, who were then seeking to adopt the child, were permitted to intervene as defendants in the Superior Court action. The plaintiff agreed to withdraw her lawsuit, and to allow the adoption to go forward, in exchange for the defendants' agreement to permit regular visitation between the plaintiff and the child during the child's minor years.[1]

The agreement between the parties was placed on record in the Superior Court on September 16, 1983. Acquiescence in the agreement was noted, in open court, by counsel for the plaintiff, for the defendants, for the commissioner, and for the minor child. The agreement was not, however, made part of the subsequent decree of the Probate Court permitting the defendants to adopt the child, although the parties to that proceeding, having all appeared in the Superior Court action, were fully aware of its terms. After the

---

[1] The "Open Adoption and Visitation Agreement" provides in relevant part:

"1. Adoption. The parties shall all cooperate fully with the state DCYS in the orderly completion of an adoption of the child by the adopting parents.

2. Termination of Rights. The natural mother will withdraw here legal challenge . . . as soon as the adopting parents have approval of their adoption application by DCYS.

3. Visitation. The adopting parents will cooperate fully with the natural-mother in the natural mother's visits with the child both now and after the adoption takes place until the child's 18th birthday. The parties agree to be guided in carrying out this provision by the present laws of Connecticut regarding reasonable visitation, which are partly embodied in Connecticut General Statutes Section 46b-56, as they pertain to visitation rights of non-custodial parents in dissolutions of marriage. The tender age of the child and her high sensitivity to her, up to the present, state of uncertainty shall be taken into account by the parties.

Each of the parties shall at all times in good faith endeavor to maintain in the child respect and affection for the other parties.

The rights of visitation shall not be exercised by the natural mother at any time or in such a manner as to interfere with the education and normal social and school activities of the child.

Visitation shall be twice a month for three (3) hours each visit at the Wawrucks' home."

adoption had been finalized, the defendants terminated all visitation between the plaintiff and the child.

The trial court, after reviewing these facts, granted the defendants' motion to strike the plaintiff's complaint because, in its view, enforcement of the "Open Adoption and Visitation Agreement" would violate Connecticut's adoption statutes. According to the trial court, adoption, as a creature of statute, must comply strictly with statutory requirements, and the existing statutes governing adoption preclude private "side agreements" that would serve to perpetuate a relationship, after adoption, between a genetic parent and an adopted child. The court noted that termination of parental rights, under General Statutes § 45-61b (g),[2] operates as a "complete severance by court order of the legal relationship . . . between the child and his parent. . . . " Furthermore, under General Statutes § 45-64a,[3] adoption creates new legal relationships in

---

[2] General Statutes § 45-61b provides in relevant part: "(g) 'Termination of parental rights' means the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption except it shall not affect the right of inheritance of the child or the religious affiliation of the child."

[3] General Statutes § 45-64a provides in relevant part: "EFFECTS OF FINAL DECREE OF ADOPTION. SURVIVING RIGHTS. A final decree of adoption, whether issued by a court of this state or a court of any other jurisdiction, shall have the following effect in this state:

"(1) All rights, duties and other legal consequences of the genetic relation of child and parent shall thereafter exist between the adopted person and the adopting parent and his relatives. Such adopted person shall be treated as if he were the genetic child of the adopting parent, for all purposes including the applicability of statutes which do not expressly exclude an adopted person in their operation or effect;

"(2) The adopting parent and the adopted person shall have rights of inheritance from and through each other and the genetic and adopted relatives of the adopting parent. The right of inheritance of an adopted person extends to the heirs of such adopted person, and such heirs shall be the same as if such adopted person were the genetic child of the adopting parent;

"(3) The adopted person and the genetic children and other adopted children of the adopting parent shall be treated, unless otherwise provided by

which the adopting parents are completely substituted for the genetic parents of an adopted person. Finally, the trial court observed that General Statutes § 45-63[4]

statute, as siblings, having rights of inheritance from and through each other. Such rights of inheritance extend to the heirs of such adopted person and of the genetic children and other adopted children, and such heirs shall be the same as if each such adopted person were the genetic child of the adopting parent;

"(4) The adopted person shall, except as hereinafter provided, be treated as if he were the genetic child of the adopting parent for purposes of the applicability of all documents and instruments, whether executed before or after the adoption decree is issued, which do not expressly exclude an adopted person in their operation or effect. The words 'child,' 'children,' 'issue,' 'descendant,' 'descendants,' 'heir,' 'heirs,' 'lawful heirs,' 'grandchild' and 'grandchildren,' when used in any will or trust instrument shall include legally adopted persons unless such document clearly indicates a contrary intention. Nothing in this section shall be construed to alter or modify the provisions of section 45-162 regarding children born through A.I.D.;

"(5) The legal relationship between the adopted person and his genetic parent or parents and the relatives of such genetic parent or parents is terminated for all purposes, including the applicability of statutes which do not expressly include such an adopted person in their operation and effect. The genetic parent or parents of the adopted person is relieved of all parental rights and responsibilities;

"(6) The genetic parent or parents and their relatives shall have no rights of inheritance from or through the adopted person, nor shall the adopted person have any rights of inheritance from or through his genetic parent or parents and their relatives, except as provided in this section;

"(7) The legal relationship between the adopted person and his genetic parent or parents and the relatives of such genetic parent or parents is terminated for purposes of the construction of the documents and instruments, whether executed before or after the adoption decree is issued, which do not expressly include the individual by name or by some designation not based on a parent and child or blood relationship, except as provided in this section."

[4] General Statutes § 45-63 (a) (1) provides: "Each adoption matter shall be instituted by filing an application in a court of probate, together with the written agreement of adoption, in duplicate. One of the duplicates shall be sent forthwith to the commissioner of children and youth services."

General Statutes § 45-63 (c) (2) provides: "At the hearing the court may deny the application, enter a final decree approving the adoption if it is satisfied that the adoption is for the best interests of the child or order a further investigation and written report to be filed, in duplicate, within whatever period of time it directs. A duplicate of such report shall be sent

requires agreements about adoption to be in writing and filed in the Probate Court. Relying on these statutory provisions, and a number of out-of-state cases, the court concluded that the contract between the parties could not confer upon the plaintiff a specifically enforceable right to visitation after completion of the adoption process.

Although the plaintiff's appeal purports to raise three issues about the enforceability of her "Open Adoption and Visitation Agreement," there is really only one question that we must resolve: did the trial court err in concluding that this agreement violated the public policy reflected in our adoption statutes?[5] We disagree with the trial court's ruling.

The validity of an "open adoption" agreement is a matter of first impression for this court. Before we address the merits of this question, we should note that the title "open adoption," which has apparently become the standard characterization of such agreements,[6] conveys a misleading impression of what such agreements intend to accomplish. The plaintiff does not seek to "open," to set aside or to diminish in any way the adoptive process that has substituted the defendants as the legal parents of the child. The plaintiff's rights are not

to the commissioner. The court may adjourn the hearing to a day after that fixed for filing the report. If such report has not been filed with the court within the specified time, the court may thereupon deny the application or enter a final decree in the manner provided in this section."

[5] The plaintiff's three issues ask us to rule separately about whether the "Open Adoption and Visitation Agreement," which is "supported by mutual consideration," is: (1) void and unenforceable as against public policy; (2) specifically enforceable as a contract right after the completion of the adoption process; or (3) violative of the public policy expressed in the Connecticut statutes governing adoption. The defendants' motion to strike was not premised on any deficiency in consideration, as the transcript of the hearing before the trial court, *Barall, J.,* makes clear.

[6] See C. Amadio & S. Deutsch, "Open Adoption: Allowing Children to 'Stay in Touch' with Blood Relatives," 22 J. Fam. L. 59 (1983–84).

premised on an ongoing genetic relationship that somehow survives a termination of parental rights and an adoption. Instead, the plaintiff is asking us to decide whether, as an adult who has had an ongoing personal relationship with the child, she may contract with the adopting parents, prior to adoption, for the continued right to visit with the child, so long as that visitation continues to be in the best interest of the child.[7]

Our statutes recognize that visitation encompasses considerations that differ from those that govern custody, guardianship or parental status. The plaintiff reminds us that, in the adoption statutes themselves, while an application for adoption must disclose pending proceedings "affecting the custody of the child to be adopted . . . [f]or the purposes of [such disclosure], visitation rights granted by any court shall not be considered as affecting the custody of the child." General Statutes § 45-63 (a) (2). The defendants maintain that this statutory distinction merely reflects the fact that Probate Court adoption proceedings necessarily must take outstanding custody orders into account, while visitation rights are not so implicated. This explanation for the distinction contained in § 45-63 may well

---

[7] The plaintiff's complaint did not clearly articulate that her claim for specific enforcement of the "Open Adoption and Visitation Agreement" was conditioned upon her ability to persuade a trier of fact that her visitation with the child would be in the child's best interest. At the trial court hearing on the motion to strike, however, the plaintiff expressly and consistently limited her claim to relief in this fashion. Obliged as we are, in ruling upon a motion to strike, to construe a complaint in the manner most favorable to sustaining its legal sufficiency; *Blancato* v. *Feldspar Corporation*, 203 Conn. 34, 36, 522 A.2d 1235 (1987); *Norwich* v. *Silverberg*, 200 Conn. 367, 370, 511 A.2d 336 (1986); we conclude that the complaint should be construed to incorporate a "best interest of the child" standard. We note that, although the trial court raised a question about the sufficiency of the complaint in this regard at the hearing, the defendants did not premise their motion to strike on this ground. Furthermore, the proposition that any and all visitation rights are impliedly premised on a factual finding "guided by the best interest of the child" finds statutory support in General Statutes § 46b-59.

be accurate but it does not eradicate the existence of the distinction and thus supports the plaintiff's position that the adoption statutes do not expressly make a visitation agreement void as against public policy.

Even more significantly, our visitation statute, General Statutes § 46b-59, permits the Superior Court, upon a proper application, to "grant the right of visitation with respect to any minor child . . . to any person . . . . In making, modifying or terminating such an order, the court shall be guided by the best interest of the child . . . . Visitation rights granted in accordance with this section shall not be deemed to have created parental rights in the person . . . to whom such visitation rights are granted. The grant of visitation rights shall not prevent any court of competent jurisdiction from thereafter acting upon the custody of such child, the parental rights with respect to such child or the adoption of such child and any such court may include in its decree an order terminating such visitation rights." In *Temple* v. *Meyer*, 208 Conn. 404, 410, 544 A.2d 629 (1988), we recently noted that this statute "leaves great latitude for the exercise of judicial discretion because it does not focus on the legal relationship of the parties involved. . . . The only criterion under § 46b-59 is the best interest of the child." See also *Manter* v. *Manter*, 185 Conn. 502, 508, 441 A.2d 146 (1981). All this plaintiff seeks is a court order consistent with the statutory constraints imposed on visitation by § 46b-59.

In light of these statutes, we are unpersuaded that the agreement between the parties in this case violates the public policy of Connecticut. It would be elevating form over substance to allow the plaintiff to obtain visitation rights by filing an appropriate "application" in the Superior Court, but to deny her the opportunity to seek such rights under a contractual umbrella.

Case law in other jurisdictions does not persuade us that we should strike down the visitation agreement in this case. To a significant extent, the cases turn on legislative determinations that vary from state to state. We note nonetheless that *People ex rel. Sibley* v. *Sheppard,* 54 N.Y.2d 320, 429 N.E.2d 1049, 445 N.Y.S.2d 420 (1981), concluded, as do we, that the statutory creation of an adoptive family does not automatically require complete severance of the child from all further contact with former relatives. Similarly, *Weinschel* v. *Strople,* 56 Md. App. 252, 261, 466 A.2d 1301 (1983), concluded, as do we, that as long as the best interest of the child is the determinative criterion, public policy does not forbid an agreement about visitation rights between a genetic parent and adoptive parents. *In re Custody of Atherton,* 107 Ill. App. 3d 1006, 438 N.E.2d 513 (1982), on which the trial court relied, is distinguishable because that decision focused on the impropriety of parental bargaining about post-adoption custody when, according to the court, the purpose of the parties' contract was to bypass judicial determinations of custody. That is not this case. '

Traditional models of the nuclear family have come, in recent years, to be replaced by various configurations of parents, stepparents, adoptive parents and grandparents. See *Temple* v. *Meyer,* supra; *Manter* v. *Manter,* supra. We are not prepared to assume that the welfare of children is best served by a narrow definition of those whom we permit to continue to manifest their deep concern for a child's growth and development. The record of the 1982 Superior Court proceedings to set aside the termination of the plaintiff's parental rights demonstrates that, in the present case, the "Open Adoption and Visitation Agreement" was openly and lovingly negotiated, in good faith, in order to promote the best interest of the child. The attorney for the child reported that the child thought

the agreement between her mother and her soon-to-be adoptive parents would be "the best world that she could imagine." This agreement did not violate public policy, either ab initio or upon the subsequent entry of a decree of adoption.

We therefore remand this case to the trial court for a hearing on the merits of the plaintiff's claim that visitation would now be in the best interest of the child. Our observations about the genesis of the "Open Adoption and Visitation Agreement" are intended to express no opinion about how that claim should be resolved in light of the circumstances presently confronting the child.

There is error, the judgment is set aside and the case is remanded to the trial court for further proceedings in accordance with this opinion.

In this opinion the other justices concurred.