[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nathaniel, born August 28, 1982, was committed to the Department of Children and Youth Services (hereafter DCYS) on November 14, 1990, Gen. Stat. 46b-129. The finding on an CT Page 3223 agreed plea of nolo contendre was Neglect (child permitted to live under conditions and circumstances injurious to his well-being and being denied proper care, attention physically and is abused) and Uncared For (child is homeless). Expectations were then set by the parties. On October 22, 1991 a petition to terminate parental rights was filed and on January 22, 1992 DCYS amended the petition. 17a-112.
The court terminates parental rights.
Service on the father was by publication. He did not respond and has not been involved in any of these proceedings. The mother did appear to contest and was represented by court appointed counsel, as was the child.
Termination is a severance of the parent/child ties. See, however 46b-59. Natural rights of parents undeniably warrant deference and, absent a powerful countervailing interest, protection. See, In re Juvenile Appeal, 181 Conn. 638,436 A.2d 290 (1980).
Although this hearing was not bifurcated, the court must find by clear and convincing evidence, first, the adjudication criteria as of the date of filing of petition or amendment and, then, the dispositional grounds as of the last hearing.
 I
Nathaniel was placed in a foster home in June 1990 following an incident of child abuse. Because of the mother's difficulties in handling her son and her own addiction to alcohol, she signed a voluntary placement. Although she was employed, she also had difficulty obtaining suitable housing.
Initial foster care was unsuccessful so Nathan shifted to the State Receiving Home. While there, he was diagnosed as a boy of average intelligence with no evidence of disorders. During the five months at the Receiving Home, there were only five visits of mother and son. There was phone contact. He moved to a Wheeler Clinic specialized foster care home at the end of January 1991; that placement is no longer available. Wheeler Clinic provided therapy for him.
The son had the mother's employment phone number and did call her while at the Clinic.
The foster care visitation plan was one hour supervised per week at the Clinic. From February 20, 1991 to January 21, 1992 the mother visited twelve times, cancelled four times and failed to show four times; all twenty appointments had been CT Page 3224 confirmed in advance by the mother. The possible visitation over these eleven months was about forty five. There were significant gaps between visits. Exhibit S-2. She found housing in different locations. The mother generally excused her failure for lack of transportation; transportation could have been arranged. The mother's visitation pattern caused great distress to Nathan extending into the visits itself. The boy would be angry and worried about her failure to visit.
Because of the mother's housing shifts, Wheeler had only an employment phone number for contact. At times the mother was living in her car. The possibility of home visits with the mother was complicated by the alcoholism of her roommates. While parents cannot deal directly with a Wheeler foster home, the Wheeler therapist was willing to act as an intermediary for the mother. Visitation could have ever been expanded if requested. The mother's last personal visit may have been one hour at Christmas 1991.
Wheeler Clinic advised the mother in June 1991 of its Evening Treatment Program for alcoholics with current openings and a sliding fee scale. Exhibit S-3, S-4. She had an alcohol odor at a Wheeler February conference and on a child visit. The mother failed to take advantage of the Wheeler offer, complaining about finances, work conflict and transportation. These excuses are not persuasive. When she was also reminded of the expectations, she admitted she failed to meet the goals. She tested positive for cocaine in June or July of 1991.
A psychiatric evaluation of Nathan in November 1991 indicated that the nine year old boy had insight into his circumstances and recognized a need for counselling. Although he had a history of inappropriate behavior in 1988 and 1989 the current evaluation revealed a pleasant youngster who had a tendency to be anxious about his sad circumstances. Exhibit S-5.
A psychological evaluation of Nathan by Dr. Freedman was conducted on December 15, 1991. Despite the importance of the evaluation, the mother failed to show. Again, Nathan displayed positive qualities: happy, intelligent, expressive, perceptive and comfortable. While he had positive feelings about his mother, he had no illusions about his mother and her failings. He was disappointed with his mother and pessimistic about her ability to rehabilitate. If his mother was unable to be family within two or three months, he wanted to be family elsewhere. Exhibit S-1. Nevertheless, the child wanted to keep in touch with his mother, even if adopted.
Dr. Freedman recommended that the child no longer be CT Page 3225 exposed to potential emotional disappointment by his mother, noting that, neither the removal of the child nor the threat of termination had motivated her. Continued uncertainty is most destructive to Nathaniel. Dr. Freedman estimated 6 months to a year before there could be certainty that the mother has rehabilitated herself and that was too long for Nathan to wait.
Nathan's therapist at Wheeler confirms positive feelings by the son toward his mother. The boy is angry and disappointed. He wants home and family attachments. He desperately wants to belong. Exhibit S-7.
Nathan was aware of his mother's alcoholism and homelessness and suffered as the child of an alcoholic. His disappointment transformed his role from child to caretaker of his mother. Exhibit S-8. The shift to adult responsibilities distorts childhood development.
Testimony from mental health professionals is accorded great weight. In re Nicoline T., 9 Conn. App. 598, 605,520 A.2d 639 (1987).
The son has judged his mother: acceptable as mother, unacceptable as parent. Her failures at visitation, her intoxication, her leaving him unattended on a home visit, and her broken promises have destroyed her credibility with her son. This young child recognizes the need for "family" with the implication of stability and security in addition to love.
At his age Nathaniel is still adoptable and has requested an adoptive family.
 II
Prior to the commitment in this case, the mother had entered an alcohol rehabilitation clinic. Following her discharge from the clinic, without participating in after care the mother remained sober for about three months but probably had relapsed prior to the DCYS commitment.
She had been arrested in connection with the abuse of Nathan which was a commitment factor. There is some uncertainty about her obligation to attend family violence classes on a resulting criminal diversion program; she attended one meeting. She is no longer in the program and has started regular probation visits.
At time of these hearings, she was waiting for an evaluation of her alcoholism; she concedes she cannot control her alcoholism without professional assistance. She had not CT Page 3226 relied on A.A.
The mother lost her job about the time of commitment. She was denied unemployment benefits and used savings and loans to avoid welfare. If she did apply she was rejected on residency grounds. She worked at Dunkin Donuts from February to October 1991. Her take home pay was about $275 per week. In late October she became employed at a fast-food restaurant where she is now a highly regarded assistant manager with no suggestion of any drinking problem. Her take home pay is about $165 per week.
At the time of commitment, she left the apartment of her abusive boyfriend. After three moves, she lived in her car for two months; The car was repossessed. She moved four times thereafter. The mother did contact the Bristol Housing Authority for assistance in locating an apartment.
She presently shares an apartment with a co-employee of the restaurant. The mother still has not been able to locate appropriate quarters if Nathaniel were to return now.
 III
The court finds that the father abandoned his son in accordance with the standard in 17a-112 (b)(1) and that there is no ongoing or positive parent-child relationship in accordance with the standard in 17a-112 (b)(4) so that the state has established jurisdiction over him. There was insufficient clear and convincing evidence on the statutory grounds alleged against him in the amendment, so those claims are denied. 17a-112 (b)(2) and (3).
The facts support a clear and convincing adjudication of statutory abandonment by the mother in the sense that the mother has failed to maintain a reasonable degree of interest concern or responsibility as to the welfare of the child.17a-112 (b)(1). Abandonment focuses on the conduct of the parent. The parent should maintain a continuing reasonable degree of concern; a sporadic showing of interest, concern or responsibility can be statutory abandonment. In re RaYna M.,13 Conn. App. 23, 35-38 534 A.2d 897 (1987).
The mother knew what had to be done to rehabilitate herself for reunification with her son. The expectations of November 14, 1990 executed by the mother involved her maintaining contact and cooperation with DCYS, visiting the child as often as DCYS permits, participating in individual and alcohol counselling, securing adequate housing and maintaining sobriety. Exhibit S-6. CT Page 3227
The evidence clearly and convincingly showed that the mother had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child she could assume a responsible position in the life of her son.17a-112 (b)(2). Personal rehabilitation means return of the mother to a previous constructive and useful role as a parent. In re Joshua A., 26 Conn. App. 58, 64, 597 A.2d 842 (1991), cert. denied. 221 Conn. 901, ___ A.2d ___ (1992).
These statutory grounds have existed for not less than one year.
The court finds that DCYS did not establish by clear and convincing evidence that the child was denied, by an act or acts of parental commission or omission of a non custodial mother, the care, guidance or control necessary for the child's physical, educational, moral or emotional well-being.17a-112 (b)(3). The court further finds that there is a positive non custodial mother/child relationship. 17a-112b(4). In re Jessica M., 217 Conn. 459, 586 A.2d 597
(1991). IV
In determining whether to terminate, the court must consider and make dispositional findings on six factors.17a-112 (d). Supplementing the above findings, the court finds:
(1) The services offered or provided to the mother to facilitate reunion were timely. Formal alcoholic rehabilitation was available at Wheeler. AA was always a possibility. The mother could participate in family therapy at Wheeler. Transportation aid was available as well as alternate visitation sites.
(2) While there were no court orders, there were court expectations. Exhibit S-6. She failed to reasonably maintain contact and cooperation with DCYS, failed to visit and to participate in individual or alcohol counselling. The mother claims to be sober for the last three months, and to recognize the importance of support services. Yet, those services are not in place, despite her relapse after discharge from the earlier rehabilitation facility. There have been periods when income was not adequate. She has been unable to procure adequate family housing. The expectation form warned her of the termination risk upon failure to achieve expectations.
(3) Whatever ties Nathaniel had with the Wheeler foster parent CT Page 3228 probably will end with the cessation of that relationship. That placement was not designed to be a long term solution for his needs. Whatever his concern for his mother, Nathan's personal need is to develop feelings and emotional ties with a person who can exercise long term physical care, custody and control over him. He is looking for a safe harbor.
(4) Nathaniel is nine years old.
(5) The mother has not made significant or reasonable efforts to adjust her circumstances, conduct or conditions to make it in best interest of Nathaniel to return him home in the foreseeable future. Her efforts at contact with her son have been inadequate. Visits have been awkward and irregular so that the meetings have been self-defeating. Contacts by the mother with Wheeler have been meager.
(6) No unreasonable acts by anyone has prevented the mother from maintaining a meaningful relationship with the child. Obviously, the mother's economic circumstances was an element in his life but the overpowering factor was alcoholism. While money can open options in adversity, alcoholism has created her present plight.
 V.
The court finds that it is in the best interest of Nathaniel to terminate the parental rights of the parents in their son Nathaniel.
The attorney for the child agrees with the termination. Reasonable efforts were made by the state to make it possible for the child to return home. Continuation in the home is contrary to the welfare of the child.
However, the court expects that Nathaniel's wish to maintain some reasonable contact with his mother will be honored by DCYS and any prospective adopting family. 46b-59; Michaud v. Wawruck, 209 Conn. 407, 551 A.2d 738 (1988). Nathaniel is already old enough to initiate contact by phone with his mother. He is wise enough to recognize his need to bond, but is unwilling to cavalierly discard his natural mother. His wishes should be respected if in his best interest.
 VI
The parental rights of the parents in their son Nathaniel are terminated. CT Page 3229
The Commissioner of the Department of Children and Youth Services is appointed statutory parent and should report to the court within ninety days on a case plan. At least every twelve months thereafter a report shall be made on the implementation of the plan. 17a-112 (i).
A treatment plan/administrative review shall be filed by June 30, 1992.
SAMUEL S. GOLDSTEIN, JUDGE