[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: PLAINTIFFS' MOTION FOR VISITATIONAND DEFENDANTS' MOTION TO STRIKE
The plaintiff grandparents* moved, pursuant to General Statutes § 46b-59,[1] for visitation with their four-year-old grandchild in this proceeding. The defendant parents object, claiming that as they are an intact, married couple, and are not contemplating divorce or separation, § 46b-59 is unconstitutional as applied to them. For the reasons stated below, pendente lite visitation is granted.
 I
The procedural and factual backdrop for this very troubling case is as follows. The plaintiffs (hereinafter plaintiffs or grandparents) are the parents of James A. Pollard, CT Page 9734 Jr., the named defendant, who is married to the defendant Maureen Pollard. The younger Pollards (hereinafter defendants or parents) have a daughter, born June 1, 1991. They entrusted the child to the grandparents for regular and frequent day care in the grandparents' home for essentially the first two years of the child's life, while the parents went to work.
As a result of a disagreement over the reason the grandmother wished to take a short `sabbatical' from the child's day care, the parents ultimately terminated the grandparents' day care of the child. The parents also reduced the child's contact with her grandparents and terminated all contact after the child's third birthday. The grandparents on numerous occasions attempted to arrange for contact and visits with the child, without success. This prompted the grandparents' complaint for custody and visitation of the child. The defendants' motion to dismiss for lack of standing and subject matter jurisdiction was denied after hearing by Judge Austin. In the meantime, the grandparents withdrew their claim for custody and now seek only visitation.
The court then appointed an attorney to represent the interests of the minor child and referred the issue of visitation to family services for mediation, and if such mediation failed, then for investigation and recommendation.
 II
The parents' motion to strike and the grandparents' motion for visitation were heard simultaneously. The younger Mr. Pollard, the grandmother and the family services officer, Linda Yuhas, testified, and her report was introduced into evidence. The parties and the attorney for the child filed briefs. From the evidence, the following facts are found.
The defendants have been married for more than eight years. They reside together and have done so continuously since their marriage. Neither has brought an action for dissolution or legal separation, and neither contemplates or intends doing so. There is one child issue of the marriage, born June 1, 1991. The child was entrusted to the plaintiffs on a regular basis for day care for the first two years of her life while the parents were at work. The parties differed about the precise amount of time the child was left with the grandparents (the parents claimed it was between three and five days a week for CT Page 9735 four to eight hours a day, while the grandparents claimed it was four to six days a week up to ten hours a day). It is undisputed, however, that the grandparents (largely the grandmother) provided care and companionship to the child consistently for the first two years of her life. During this time, the child and the grandparents developed a warm, close and loving relationship.
Shortly after, the relationship between the parents and grandparents began to disintegrate. The parents attribute the cause of the disintegration to two slapping incidents in which the grandmother sought to discipline the child. The parents are steadfastly opposed to corporal punishment. The grandmother concedes a single slapping incident on the child's hand when she was misbehaving and characterizes it as a mild slap.
The parents also disapproved of the grandparents' refusal to follow their instructions with respect to the child's diet, napping and other routines. The grandmother experienced a health problem and was told by her doctor to take a few weeks off from her day care responsibility, and she did so by taking some vacation. The grandparents appear to believe that the parents perceived this as an abandonment of the day care agreement. In any event, the grandparents' access to and contact with the child was reduced by the parents, despite attempts by the grandparents to see her, finally culminating in a complete breakdown after the child's third birthday, and the grandparents have not been with the child since.
The parents are suitable and fit parents, love and care for the child and maintain a more than adequate home for her. They went to extraordinary lengths to eliminate the need of day care for the child by working different shifts in full-time jobs. In doing so, they have obviously curtailed their own time with each other.
The grandparents are also caring, loving and affectionate to the child, and are suitable and fit to enjoy visitation with the child, and have a more than adequate home.
The family services officer, Yuhas, interviewed the parties and talked with the child. She visited the homes of each couple and interviewed a number of relatives, friends and neighbors. CT Page 9736
Yuhas described the grandparents as "kind and decent people who did not use corporal punishment as a usual form of discipline and who had a remarkably close, loving relationship with their granddaughter".
Yuhas described the child as bright, vivacious and outgoing and describes the defendants as excellent parents and does not question the quality of their parenting or their parenting ability. She disagreed, however, with the parents' decision to exclude the grandparents from the child's life. It was Yuhas' conclusion that the parties were engaged in a `power struggle'. She also concluded that contact between the child was not only appropriate but necessary, and decidedly in the child's best interest. She recommended immediate visitation to be expanded after two months to include overnight visitation and one week annually in the summer.
I find that the parents' reasons to cut off contact between the child and her grandparents were insubstantial and pretextual.
The court finds Yuhas' testimony thoughtful, incisive and credible, and agrees that it clearly would be in the child's best interest to maintain the close and loving relationship she has with her grandparents. I also find from the evidence that a denial of visitation with the grandparents would be harmful to the child and not in her best interest. The attorney for the child vigorously supported the conclusions and recommendations of Yuhas.
The defendants also basically claim that the hostility which has developed between the parties would be detrimental to the child if visitation were forced upon the parents. Although hostility certainly may be a factor in the evaluation of a child's best interest in the determination of competing custody or visitation claims, most courts generally consider the benefits to a child which accrue from an ongoing, loving relationship with a grandparent to outweigh any possible trauma to a child. Foster and Freed, Grandparent Visitation: Vagaries and Vicissitudes, 23 St. Louis ULJ 643, 660 (1979). To argue that hostility or animosity between contestants over visitation should be a controlling factor in denying visitation to the custodial contestant totally loses sight of the child's best interests. In child custody [or visitation] proceedings, CT Page 9737 parents lack the necessary professional and emotional judgment to further the best interests of their child. And, just as "[a] parent's judgment is or may be be clouded with emotion and prejudice due to the estrangement of husband and wife," Taff v.Bettcher, 35 Conn. App. 421, 428 (1994); so may such parents' judgment be clouded by the animosity created between parents and grandparents as here. Moreover, the parties here, when realizing that bitterness and animosity between them is not in the child's best interest may achieve a truce, peace treaty or even reconciliation.
 III
I now turn to the parents' objection that § 46b-59 is unconstitutional as applied to them, as they allege that an order granting rights of visitation would be an impermissible intrusion into and infringement upon their "constitutionally protected right of freedom of personal choice in matters of family life".
At common law, grandparents had no right of visitation with their grandchildren; the parental obligation to allow visitation was considered "moral, not legal". Minkon v. Ford,66 N.J. 426, 431, 332 A.2d 199 (1975) (quoting Succession ofReiss, 46 La. Ann. 347, 353, 15 So. 151, 152 (1894).
"General Statutes § 46b-59 permits the Superior Court, upon a proper application, to `grant the right of visitation with respect to any minor child . . . to any person. . . . In making, modifying or terminating such an order, the court shall be guided by the best interest of the child. . . . Visitation rights granted in accordance with this section shall not be deemed to have created parental rights in the person . . . to whom such visitation rights are granted. . . .'" Michaud v. Wawruck,209 Conn. 407, 414, 551 A.2d 738 (1988); see also Temple v.Meyer, 208 Conn. 404, 408, 544 A.2d 629 (1988).
Section 46b-59 "`leaves great latitude for the exercise of judicial discretion because it does not focus on the legal relationship of the parties involved. . . . The only criterion under § 46b-59 is the best interest of the child.'"[2]Michaud v. Wawruck, supra, 209 Conn. 414; In re Jennifer P.,17 Conn. App. 427, 428, 553 A.2d 196, cert. denied, 211 Conn. 801,559 A.2d 1136 (1989). Indeed, state intervention to order third party visitation under § 46b-59 is entirely based on the best CT Page 9738 interest of the child's standard.
"The potential for undue parental influence is greatly increased in the event of a specific conflict of interest between parent and child." In re Manuel R., 207 Conn. 725, 739 40,543 A.2d 719 (1988); see e.g., Parham v. J. R., 442 U.S. 584,604, 99 S.Ct. 2493, 61 L.Ed. 101 (1979) (concluding that "the child's rights and the nature of the commitment decision are such that parents cannot always have absolute and unreviewable discretion to decide whether to have a child institutionalized)"; Planned Parenthood of Central Missouri v.Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (declaring unconstitutional a state statute that granted parents an absolute veto over a minor child's decision to have an abortion).
More specifically, the plaintiffs claim, that if the court permits the paternal grandparents visitation, pursuant to § 46b-59, then § 46b-59 is unconstitutional because it infringes on their familial right to privacy under the fourteenth amendment of the federal constitution.[3] The paternal grandparents argue that § 46b-59 is constitutional, as applied to the facts of the present case. The attorney for the minor child argues that the parents, like the parents in Lehrer v.Davis, 214 Conn. 232, 571 A.2d 691 (1990), have failed to make an adequate factual showing to meet their burden of demonstrating § 46b-59's allegedly adverse impact on their constitutional rights.
In analyzing the constitutionality of § 46b-59, I first review the parental interest claimed to be constitutionally protected. I then consider the extent to which the state may infringe on that interest, and lastly, determine whether the scope of the infringement authorized by the statute is permissible.
In Lehrer v. Davis, supra, the court noted the absence of the following facts:
 [T]he extent of the earlier relationship between the plaintiffs and the children; the reasons for the defendant's termination of face-to-face or telephone contact between the plaintiffs and the children; the presence or absence of reason to believe CT Page 9739 that one or both of the plaintiffs may abuse the children or act in some other way inconsistent with their best interest; the presence or absence of reason to believe that one or both of the defendants may be abusing the children or may be acting in some other way inconsistent with their best interest; or the opinions of the children themselves with respect to the proposed visitation. Id., 234.
In the present case, information as to the existence or nonexistence of these facts is present along with others, thus permitting this court to find that visitation is in the best interest of the minor child. Therefore, an adequate factual record exists to determine the constitutionality of General Statutes § 46b-59 as applied to the facts in the present case.
"[T]he party attacking a validly enacted statute . . . bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt and [the court will] indulge in every presumption in favor of the statute's constitutionality." (Internal quotation marks omitted.) Serrano v. Aetna Ins. Co.,233 Conn. 437, 448 n. 13, A.2d (1995).
 It is . . . a well settled principle of judicial construction, that before an act of the legislature ought to be declared unconstitutional, its repugnance to the provisions or necessary implications of the constitution should be manifest and free from all reasonable doubt. If its character in this regard be questionable, then comity, and a proper respect for a coordinate branch of the government should determine the matter in favor of the action of the latter. (Internal quotation marks omitted.) Moore v. Ganim, 233 Conn. 557, 571-72 (1995).
"Finally, while the courts may declare a statute to be unconstitutional, our power to do this should be exercised with caution and in no doubtful case." (Internal quotation marks omitted.) Federal Deposit Ins. Co. v. Voll, 38 Conn. App. 198,203 (1995). CT Page 9740
"In construing a statute . . . [the court] will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." State v.Metz, 230 Conn. 400, 420, 645 A.2d 965 (1994).
The Connecticut Supreme Court in Lehrer v. Davis,
supra, 214 Conn. 232, in dicta, suggested that a finding of harm to the child is not necessary for application of the visitation statute.[4] "[F]reedom of personal choice in matters of . . . family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment. . . . Our law recognizes that parents have significant constitutionally protected rights to the companionship, care, custody and management of their children. . . . This right to family integrity includes the most essential and basic aspect of familial privacy — the right of the family to remain together without the coercive interference of the awesome power of the state." (Citations omitted; internal quotation marks omitted.) Id., 236-37.
"[I]t is in recognition of this that [our] decisions have respected the private realm of family life which the state cannot enter." Ginsberg v. New York, 390 U.S. 629,88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (the court recognized general parental authority over children but upheld the state law limiting the availability of sex materials to minors).
"The family is not, however, beyond regulation in the public interest, and the rights of parenthood are not beyond limitation. . . . The state's countervailing interest in the welfare of a child justifies appropriately bounded state intervention . . . as long as the state acts in accordance with the requirements of due process."[5] (Citations omitted.)Lehrer v. Davis, supra, 214 Conn. 237. Moreover, "[e]ven given the fact that the parents have a constitutional right to make decisions affecting the family, the magnitude of the infringement by the state is a significant consideration in determining whether a statute will be struck down as unconstitutional." Herndon v. Tuhey, 857 S.W.2d 203, 208 (Mo. en banc 1993).
The state has a competing interest in the welfare of children within its jurisdiction, and may, as parens patriae, intervene in the family if a child's welfare is at stake. SeePrince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. CT Page 9741 645 (1944). Acting as parens patriae, the state can require that children be educated, inoculated against disease, restrained when traveling in motor vehicles, forbidden employment under a certain age, protected from abuse or neglect, given medical care, and required to be indoors during prescribed nighttime hours, over the objections of the parents. Therefore, it is evident that the state may impose reasonable regulations that do not substantially interfere with the parents' fundamental rights. Accordingly, it follows that parental rights are not absolute, but are subordinate to the state's parens patriae power, and must yield to the welfare and best interests of the child
In Zablocki v. Redhail, 434 U.S. 374, 386,98 S.Ct. 673, 54 L.Ed.2d 618 (1978), concerning the magnitude of the infringement that is required to render a marriage statute[6]
unconstitutional, the court stated that "[b]y reaffirming the fundamental character of the right to marry, we do not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed." (Emphasis added.) Herndon v. Tuhey, supra, 857 S.W.2d 208.
Furthermore, the court applies "strict judicial scrutiny only when legislation may be said to have deprived, infringed, or interfered with the free exercise of some such fundamental right or personal liberty. If the impact of the regulation does not rise to the level appropriate for . . . strict scrutiny, then [the court's] inquiry is limited to whether the state law bears some rational relationship to legitimate state purposes." (Internal quotation marks omitted.) Herndon v.Tuhey, supra, 857 S.W.2d 208-09, quoting from Justice O'Connor's dissent in Akron v. Akron Center for ReproductiveHealth, 462 U.S. 416, 461-63 103 S.Ct. 2481, 76 L.Ed.2d 687
(1983), overruled by, Planned Parenthood of SoutheasternPennsylvania v. Casey, ___ U.S. ___, 112 S.Ct. 2791,120 L.Ed.2d 674 (1992). (Plurality opinion by Justice O'Connor.)
In a number of cases the United States Supreme Court has held state statutes unconstitutional in light of the parental right to familial privacy. See e.g., Santosky v.Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599
(1982); and Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. CT Page 9742 1208, 31 L.Ed.2d 551 (1972) (encompassing complete and permanent termination of parental rights); Wisconsin v. Yoder,406 U.S. 205, 232-33, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (Wisconsin could not require Amish children to attend school after eighth grade because further education with non-Amish teachers interposes a serious barrier to the integration of the child into the Amish community); and Pierce v. Society ofSisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 69 L.Ed. 1070
(1925) (concerning what schools children are to attend); Meyerv. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042
(1923) (involving the prohibition on teaching certain foreign languages in any schools, public or private, to children who had not yet completed the eighth grade); Moore v. City of EastCleveland, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (involving housing occupancy prohibitions based on a narrow definition of family).
As can be seen, these cases involve significant andsubstantial infringements on the parental right to familial privacy. See Herndon v. Tuhey, supra, 857 S.W.2d 209. In contrast, visitation pursuant to General Statutes § 46b-59
constitutes a far lesser intrusion on a family. I also emphasize that § 46b-59 specifically states that parental rights are not created in the person to whom visitation rights are granted. In King v. King, 828 S.W.2d 630, 632 (Ky.) cert. denied, 113 S.Ct. 378, 121 L.Ed.2d 289 (1992), the Kentucky Supreme Court upheld the constitutionality of the Kentucky visitation statute. In deciding this issue, the Kentucky court stated:
 In an era in which society has seen a general disintegration of the family, it is not unreasonable for the General Assembly to attempt to strengthen familial bonds. . . . There is no reason a petty dispute between a father and a son should be allowed to deprive a grandparent and grandchild of the unique relationship that ordinarily exists between those individuals. . . . That grandparents and grandchildren normally have a special bond cannot be denied. Each benefits from contact with the other. The child can learn respect, a sense of responsibility and love. The grandparent can be invigorated by exposure to youth, can gain an insight into our changing society, CT Page 9743 and can avoid the loneliness which is so often a part of an aging parent's life. These considerations by the state do not go too far in intruding into the fundamental rights of the parents.
See also, Deweese v. Crawford, 520 S.W.2d 522
(Tex.Civ.App. 1975) (rejecting an attack on the constitutionality of the Texas statute authorizing grandparent visitation); and,H. F. v. T. F., 483 N.W.2d 803 (Wisc.) cert. denied,113 S.Ct. 408 (1992) (granting paternal grandparents rights to visit with grandchild despite adoption of child by stepfather).
In Hawk v. Hawk, 855 S.W.2d 573 (Tenn. 1993), also a grandparent visitation case in the context of an `intact family', the Tennessee court struck down the Tennessee visitation statute as unconstitutional under its constitution. The Hawk court held that unless substantial harm threatens a child's welfare the state cannot intervene without a sufficiently compelling justification. Therefore, under Tennessee's law the state may not interfere in any parental decision that may adversely affect a child unless the parent's action "substantially endanger[s] the welfare of their children." Id.
This case is inapposite, however, as it was decided under the Tennessee Constitution, and the same standard does not apply under the federal constitution unless there is a substantial infringement by the state on a family relationship. See Herndon v. Tuhey, supra, 857 S.W.2d 210. But, see Brooksv. Parkerson, 265 Ga. 189, 454 S.E.2d 769 (Ga. 1995) (two justices dissenting) (holding grandparent visitation statute unconstitutional under both federal and state constitutions as violating liberty interest of parents without a showing that failing to allow visitation over parents' objections would be harmful to child).
More persuasive is the holding in Roberts v. Ward,126 N.H. 388, 493 A.2d 478, 482 (1985) which stated that "in balancing the child's rights to know and associate with her grandparents against the parent's right to custodial autonomy, we note that we are dealing here only with visitation rights. [G]ranting visitation is a far lesser intrusion, or assertion of control, than is an award of custody and thus not nearly as invasive of parents' rights." Also, it is evident that § 46b-59
CT Page 9744 contemplates only periodic or recurring visitation, which may be allowed only if a trial court finds visitation to be in the best interest of the child. Furthermore, it must be again emphasized that § 46b-59 provides in part that "[v]isitation rights granted in accordance with this section shall not be deemed to have created parental rights in the person or persons to whom such visitation rights are granted." Thus, it can be seen that the statute is narrowly tailored to express and protect only the legitimate state interests at stake. See Roe v. Wade, 410 U.S. 113,155, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).
In addition, "[t]he placement of the burden of proof on the party seeking visitation . . . and the court's judicial discretion to review the facts may provide the parents . . . with at least some of the constitutional safeguards to which they are entitled. . . . [T]he trial court may wish to consider other procedural devices designed to minimize premature intrusions into the family, such as a show cause hearing with the burden of proof on the plaintiffs, the appointment of an attorney for the children, and pretrial conciliation sessions with the Family Support Services." Lehrer v. Davis, supra, 214 Conn. 237 n. 4. All these procedural protections have been substantially provided in this case to the parties involved.
Moreover, "[t]he fact that a family is intact does not guarantee the absence of child abuse. Even absent child abuse,there is no compelling constitutional requirement that thelegislature must defer, in every instance, to the childrearingpreferences of the nuclear family. To assert that, as a matter of law, a widowed, divorced, remarried, or unmarried parent is subject to greater [s]tate interference than a married parent would be to assert that the former is less fit than the latter to raise his or her own child". (Internal quotation marks omitted; emphasis added.) Id., 238-39. In the context of a custody dispute, the Connecticut Supreme Court has stated that it "must reject the claim of the so-called parental rights theory under which the parent has rights superior to all others except when [he or she] is proved unfit. . . . If, for example, there has been an unusually protracted period of separation between parent and child, even a fit parent may possibly be found to have contributed to or acquiesced in a situation in which custody must be yielded to another." (Citations omitted; internal quotation marks omitted.) In re Juvenile Appeal(Anonymous), 177 Conn. 648, 661-62, 420 A.2d 875 (1979). CT Page 9745
"[T]he legislature may choose to recognize a public interest in affording a child access to those outside the nuclear family who manifest a deep concern for his or her growth and development. Ours is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family." (Internal quotation marks omitted.) Lehrer v. Davis,
supra, 214 Conn. 239. "Traditional models of the nuclear family have come, in recent years, to be replaced by various configurations of parents, stepparents, adoptive parents and grandparents. . . . We are not prepared to assume that the welfare of children is best served by a narrow definition of those whom, we permit to continue to manifest their deep concern for a child's growth and development." (Citations omitted.) Michaudv. Wawruck, supra, 209 Conn. 415.
 The legislative determination to allow grandparents, and others with a special interest in a child's well-being, the opportunity to demonstrate that they may significantly contribute to the best interest of the child finds constitutional support, furthermore, in the recognition that [t]he constitutional concerns are not entirely parental because the preservation of family integrity encompasses the reciprocal rights of both parent[s] and children. . . . [T]he children themselves have constitutionally protectible interests The importance to children of stability and continuity in their close relationships is well recognized. Psychiatrists and psychologists . . . unanimously counsel that children should maintain and retain meaningful relationships and that to deny them continuing contacts is a deprivation. . . . Stability, continuity and opportunity, of and for meaningful associations are said to build a healthy psyche. (Citations omitted; internal quotation marks omitted.) Lehrer v. Davis,
supra, 214 Conn. 239-40.
"[R]eciprocal rights to due process call for a flexible and fact-specific balancing of interests that cannot be accomplished without an inquiry into the particular CT Page 9746 circumstances of the case." Id., 240. "[T]he best interest of the child is not served by adherence to a constitutional standard that deprives states of their legislative ability to address the significant domestic relations problems within their borders." R. O'Brien, "An Analysis of Realistic Due Process Rights of Children Versus Parents," 26 Conn. L. Rev. 1209, 1211 (1994).
"As one noted commentator has suggested regarding cases that restrictively construe grandparent visitation statutes on constitutional grounds: `[They] provide . . . [a] graphic illustration, if any is needed, of the distortions and unreality resulting when notions of constitutional `rights' are injected into custody disputes. The parents, the child, and perhaps the grandparents all have interests in these cases, but it is quite unrealistic to translate these interests into constitutional `rights' having uncertain origins and vague outlines.'"[7] Bailey v. Menzie, 542 N.E.2d 1015, 1019 n. 3 (Ind.App. 3 Dist. 1989), quoting 2 Clark, The law of Domestic Relations in the United States (2d Ed. 1987), § 20.7, p. 538.
However, courts have also focused instead on the benefits a child gains from a healthy, loving relationship with its grandparent. As one court said, "[A] very special relationship often arises and continues between grandparents and grandchildren. The tensions and conflicts which commonly mar relations between parents and children are often absent between those very same parents and their grandchildren. Visits with a grandparent are often a precious part of a child's experience and there are benefits which devolve upon a grandchild from the relationship with his grandparents which he cannot derive from any other relationship." Minkon v. Ford, supra, 332 A.2d 204-05.
And, in Preston v. Mercieri, 573 A.2d 128, 130 (N.H. 1990), a case which held that a grandmother's right to visit her grandchild survived a stepparent adoption, the court said:
 In most families blessed with a new generation of issue, the door to the young ones is unguarded and safe; grandparents do not watch to invade another's right or guard their own. But for grandparents cast out from their grandchild's world, the closing door invites inquiry as to what effect, if any, visitation has upon the child's CT Page 9747 welfare. When grandparents have cherished a child since its birth, holding, prattling, on their knees, sharing its moments of gladness and comforting it in hours of distress, the child's love and returned affection beget instinctive feelings of filial attachment and right.
The Preston court observed that there has been a proliferation of statutes providing for grandparent visitation when the nuclear family has been disrupted by reason of death or divorce. That court continued,
 [O]ther jurisdictions have statutorily expanded the category of grandparents who may petition for visitation, authorizing visitation where parental rights are terminated . . .; or when the parents have returned with their child to the grandparental nest, and the grandchild has lived with the grandparents for an extended period of time, . . .
 Moreover, at least twenty jurisdictions have "open-ended"[8] statutes permitting any grandparent to petition for visitation, irrespective of the child's custodial status. (Citations omitted.) Id., 131-132.
 IV
In Connecticut, it is clear that determinations of visitation rights are to be guided by the best interests of the child. And, in our state, the justification for a visitation order does not depend upon notions of bloodlines or kinship; rather, it is primarily the interests of the child which are protected, and not those of the grandparents. Here, a substantial relationship exists between the child and her grandparents. The child knows and remembers them and has a strong emotional tie to them. That powerful bond was forged during the more than two-year period which the parents created by their entrustment of the child to the grandparents to satisfy their need for day care. This created a source of love and affection for the child, and an important relationship which it would be cruel and inhumane to end, both as to the child and the grandparents. This result CT Page 9748 would be clearly harmful to the child and detrimental to her best interests.
In balancing the reciprocal rights of the parents and child, the best interests of the child should be paramount. "[T]he day has long since passed when the rights of infants to be properly nurtured are subordinate to the strict legal rights of parents or others, in and over them, and they regarded as chattels to be disposed of as if title to them passed like any ordinary property." In re Lippincott, 124 A. 532, 533 (1924), aff'd, 128 A. 254 (N.J. 1925).
Moreover, "[i]t . . . [is] shortsighted indeed, for this court not to recognize the realities and complexities of modern family life, by holding today that a child has no rights, over the objection of . . . (its) parent(s), to maintain a close extra-parental relationship. . . ." Roberts v. Ward, supra, 493 A.2d 481, citing Bartlett, Rethinking Parenthood as an Exclusive Status: The Need for Legal Alternatives when the Premise of the Nuclear Family has Failed, 70 Va. Law Rev. 879 (1984).
 V
When considering all of the circumstances in weighing the interests of the minor child against the rights of the parents, the court finds that the pendente lite visitation order set forth below, pursuant to General Statutes § 46b-59, does not rise to the level of a significant infringement of the parents' right to familial privacy. In sum, General Statutes § 46b-59, as applied to the facts in this case, bears a rational relationship[9] to the legitimate state purpose of protecting the welfare of the minor child by affording her access to her paternal grandparents who manifest a deep concern for her growth I and development and have a special interest in the child's well being. The defendant parents have not met their heavy burden of proving that § 46b-59 is unconstitutional as applied to the facts of this case, and this court may not second guess the legislature.
The defendants' motion to strike is denied and the plaintiffs' motion for visitation is granted.
The following orders are therefore entered:
(1) The grandparents shall have visitation with the CT Page 9749 child every other Sunday from 12:00 p.m. to 5:00 p.m. commencing September 9, 1995, and may telephone the child once per week commencing September 6, 1995. The grandparents shall provide transportation both ways.
(2) Prior to September 6, 1995, the parents shall provide the grandparents with dietary instructions for the child, in writing, with a copy to the child's attorney, which they shall comply with. The grandparents shall not use corporal punishment, including slapping or spanking, to discipline the child.
(3) The parties shall participate in the Parenting Education Program pursuant to § 46b-69b, and in mediation with Family Services.
(4) The visitation shall be reviewed by Family Services on or about January 5, 1996.
(5) The child's attorney may file an application for attorney's fees. Upon the filing of same, the plaintiffs and defendants are directed to submit financial affidavits, unless of course, the parties are able to resolve the payment and allocation of such fees among themselves.