[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a Memorandum of Decision as to a Visitation Complaint brought pursuant to Connecticut General Statute Section 46b-59. The allegations of the Complaint as to personal jurisdiction were not disputed and are found as alleged in the pleadings. The threshold issue of subject matter jurisdiction has been fully addressed in the Court's (Axelrod, J.) Memorandum of Decision dated March 3, 1999, in which the defendant's motion to dismiss was denied. The complaint alleges that the plaintiff, while not a legal relative of the child, has an emotional and psychological relation to the child, and as such, it would be in the best interest of the child to allow visitation under the terms of the Statute. The defendant is the adoptive mother of the child.
"Our statutes recognize that visitation encompasses considerations that differ from those that govern custody, guardianship or parental status." Michaud v. Wawruck,209 Conn. 407, 413 (1988). The language of Connecticut General Statute Sec.46b-59 clearly reflects that view in providing that "The Superior Court may grant the right of visitation with respect to any minor child or children to any person, upon an application of such person. Such order shall be according to the court's best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable, provided the grant of such visitation rights shall not be contingent upon any order of financial support by the court. In making, modifying or terminating such an order, the court shall be guided by the best interest of the child. . . ." (Emphasis provided). It is in that context that the court makes the following findings of fact and enters the orders contained herein.
The parties met in 1985, began dating, developed a relationship, and eventually moved in together in April or May of 1986. At that time, the parties entered into what was described by the plaintiff as a "committed lesbian relationship". That partnership lasted a number of years, during which the defendant worked as a nurse anesthesiologist, and the plaintiff pursued graduate degrees in her chosen field of languages. In time, the plaintiff became a teacher of languages. A number of years into CT Page 12969 the relationship, the parties started to discuss the possibility of raising children, which discussion led to the decision that the plaintiff would attempt to have a child by means of alternative insemination. The parties agreed that the plaintiff would become pregnant because of the two, her age, her employment and her financial circumstances were more favorable to her and to the parties as a couple. That decision was taken late in 1991, and the plaintiff attempted several times to become pregnant in this fashion, also underwent procedures towards that end, all of which were ultimately unsuccessful. The testimony of both parties indicates that those decisions were made jointly, with the intent that they would both participate fully in the raising of the child.
During the time the parties were attempting to have children by means of insemination, they learned of the possibility of adoption in the State of Texas through a program which sought placement of the children of terminally ill parents. After some preliminary calls and the gathering of information, the parties traveled to Texas in December of 1993. They met the natural mother of the child ultimately adopted. Both the plaintiff and defendant recounted that they explained to both the placement agency and the natural mother that they were a lesbian couple and that it was their intention to raise the child together as a couple. Both testified similarly that they made arrangements and commitments to the natural mother as to the time and manner that the child would be placed with them.
After the parties returned to Texas on subsequent visits, the child eventually came to Connecticut in or about June of 1994. The plaintiff testified that Jewish Family Services performed a study, including home visits, for purposes of the adoption. At the time of the study, the plaintiff and the defendant held themselves out to be a couple for all intents and purposes, including raising of this child. For purposes of the adoption, it was decided that the defendant would be the adoptive parent The testimony of the parties indicates that both women could not adopt the child in the State of Texas. Based upon the defendant's employment history, her ownership of a home and overall superior financial circumstances, the parties decided jointly that the defendant was a better candidate for the adoption. The adoption was approved in June, 1995, and the defendant Kate Cameron became the legal parent of Jessica Cameron, then age five (5). The plaintiff had no legal relation to the child. CT Page 12970
At the time the child came to live with the parties in 1994, she had what appear to have been significant developmental delays. Her communication skills were described as poor, and the parties were under the impression that a psychological report had described her as being borderline retarded. In addition, the child had undergone a number of significant episodes of trauma. Working together, the parties worked to overcome these problems and deficiencies. The child learned English, and developed to her appropriate grade level by the time she was scheduled to enroll in Kindergarten. During this time, and up until the separation of the parties, the day to day care of the child was provided by the plaintiff, Andrea Antonucci. Again, that decision was made jointly by the parties. The reasons considered in making that decision included finances, employment, and the daily schedule of the parties. The parties raised the child as a couple for approximately three and one half years, during the time the child was between four and seven years of age. Again, during that time, decisions regarding the child were made jointly, as was the care provided for the child. The parties also discussed the issue that the plaintiff had no legal relationship to the child, and were concerned about the status of the child in the event the defendant were to die. The testimony of both parties, the child's pediatrician, the Family Relations Officer, and lay witness indicates clearly that the child has significant relationships with, and emotional attachments to both parties.
In November, 1997, the relationship of the parties changed dramatically in that the plaintiff moved from the family home. Each party cites different reasons for the break up of the relationship, and the defendant stated that there had been difficulties in the relationship as early as 1994. For whatever reason, the plaintiff's move from the home ended the relation between the parties as a couple. Following that move, the parties had informally agreed on the issue of visitation. The plaintiff had access to the child two times during the week, including overnight, and each other week end. There also appears to have been additional contact at the home of the defendant between the plaintiff and the child. That schedule lasted for approximately nine (9) months, until unilaterally terminated by the defendant. The plaintiff claims that visitation was terminated when the defendant realized that there was not going to be a reconciliation of the parties. The defendant claims the action was taken in response to what she perceived to be negative behavior of the child which she attributed to the visits with the plaintiff. The action of the defendant in this regard was at best CT Page 12971 misguided and at worst vindictive, and did not fully consider the effect of these actions on the child.
After visitation was stopped, the plaintiff continued to see the child, albeit surreptitiously. Knowing the child's schedule, the plaintiff would see the child at swimming or sailing lessons, when the child was being watched by a friend of the parties', and even at the home of the defendant's mother. Both the plaintiff and the child continued to initiate and receive contact from the other. At least some of the meetings between the plaintiff and the child were known to the defendant, and even though she did not lend her permission to these meetings she took no overt action to prevent them.
The child is presently described as being bright, intelligent, charming, capable, dynamic and manipulative, to employ only some of the adjectives used. The child has also indicated a clear desire to have visitation with the plaintiff. The child's pediatrician, the family relations study, and the child's attorney all urge the Court to award visitation based upon the best interest of the child.
Our Supreme Court has stated that "Traditional models of the nuclear family have come, in recent years, to be replaced by various configurations of parents, stepparents, adoptive parents and grandparents See Temple v. Meyer, supra; Manter v. Manter,
supra. We are not prepared to assume that the welfare of children is best served by a narrow definition of those whom we permit to continue to manifest their deep concern for a child's growth and development." Michaud v. Wawruck., 209 Conn. 407, 415 (1988).
Accordingly, the Court finds that it will be in the child's best interests to enjoy visitation with the plaintiff, and the following orders are entered:
Visitation with Andrea Antonucci shall take place alternate weekends from Friday after school or school activities through Sunday at 5:00 P.M. When school is not in session, Friday visitation shall begin at the end of the child's scheduled activities or Ms. Antonucci's work day, whichever is earlier. If the child has no regularly scheduled activities, visitation may begin when Ms. Cameron leaves for work that morning or at 9:00 A.M., whichever is earlier. (To begin October 01, 1999).
Each Tuesday and Thursday after school or school activities until CT Page 12972 7:30 P.M. When school is not in session, visitation shall begin at the end of the child's scheduled activities or the end of Ms. Antonucci's work day, whichever is earlier. If the child has no regularly scheduled activities, visitation may begin when Ms. Cameron leaves for work that morning or at 9:00 A.M., whichever is earlier.
That portion of the family relations report (dated July 28, 1999) entitled "III Holidays and Vacations" which comprises all of pages numbered 7 and 8, including the provisions as to "Telephone Contact" and "Further Recommendations" is adopted in their entirety, unless altered by the foregoing orders, and incorporated as orders of this Court.
Financial orders with respect to support and attorneys fees are deferred until submission of the fee request from the attorney for the minor child.
Robaina, J.