Memorandum of Decision
On April 21, 1997, the Department of Children and Families (DCF) filed a petition alleging that David E., a minor child, was neglected and uncared for. On November 19, 1997, prior to a neglect adjudication, DCF filed a petition to terminate the parental rights of David's mother, Keelin E. On December 1, 1997, the court consolidated these petitions and gave them coterminous status. On June 22, 1998, the court granted the grandmother's motion to intervene for dispositional purposes. The grandmother subsequently filed motions for increased visitation. A consolidated trial of the coterminous petition and the grandmother's motions took place on October 5, October 6, and December 14, 1998, and January 29, 1999.[2] For the reasons stated below, the court grants the neglect and termination petitions and denies the motions for transfer of guardianship and visitation.
FACTS
The Court finds the following facts and credits the following evidence. The mother, Keelin E., was thirty-five years old at the time of trial. She is a high school graduate. She has a history CT Page 1524 of mental illness and a diagnosis of chronic schizophrenia.
Through a non-marital relationship, Keelin had a baby boy in 1987. Due to the mother's mental health problems, the boy was placed in the care of the maternal grandmother, Ann E. After a year and a half of dealing with the threatening behavior of the boy's father, the grandmother gave the boy up for adoption.
In 1989, the mother had another boy through the same boyfriend. The child was placed in DCF care, the mother's parental rights were terminated, and the boy was later adopted.
In the summer, 1996, the mother became pregnant again. DCF alleges that the father is unknown. According to the mother, the boy is the product of a brief relationship she had with a cab driver from New York, whom she met at the Institute of Living in Hartford. During her pregnancy, the mother was not compliant with her medication and did not nourish herself adequately. Accordingly, the mother was readmitted to the Institute of Living in February, 1997. On April 11, 1997, however, while the mother was due, the mother left the Institute of Living and was found at the Hartford train station, where she was attempting to find transportation to New York.
On April 13, the mother gave birth to David E. During their hospital stay, the mother failed to keep the baby fed, clothed, warm, and dry. The mother nonetheless threatened to kill herself if she could not go home with the baby. The maternal grandmother, although present and helpful at the hospital, reported that she would be unable to care for the infant on a full time basis due to her own medical problems. Accordingly, on April 17, DCF invoked a 96 hour hold on the baby, see Conn. Gen. Stat. §17a-101g, and, on April 21, 1997, the Court granted an order of temporary custody. DCF placed David in a licensed foster home.
Upon the mother's discharge from the Institute of Living on May 5, 1997, she returned to her apartment and continued services through Inter-Community Mental Health. At first, visits with the child took place at her apartment for two hours per week. The grandmother attended. In June, 1997, the grandmother again declined to provide a plan for David, citing the fact that she had just retired from state employment and had health and financial concerns.
In September, 1997, David went to a different foster home, CT Page 1525 where he remains to this day. The length of visits at the mother's apartment gradually increased to one six hour visit per week. Attending the visits were a visiting nurse, a psychologist, the Birth to Three agency, a parent aide, and DCF staff, who were all there to work with the mother on her parenting skills. In addition, the mother attended parenting classes at a local hospital. Despite all this assistance, the mother's parenting skills remained poor. She was unable independently and appropriately to change diapers, bathe the baby, child-proof her apartment, and recognize the baby's needs. Although the mother had a sincere desire to care for the child, her mental illness prevented her from providing verbal stimulation and expressing appropriate emotions.
Due to a court order, DCF continued to provide extensive parenting services at the mother's weekly visits with David after the filing of the termination petition in November, 1997. Because the mother would hand over her parenting duties to the grandmother when the latter was present, the grandmother's presence was limited to one-half hour. The mother, although at times showing minimal progress, continued to struggle with making independent judgments about the needs of the baby. At times, the mother would sit and stare blankly for five to ten minutes without seeming to be aware of her son.
In November, 1997, after the grandmother's visits were limited to one-half hour, the foster parents offered the grandmother the opportunity to come to their home for unlimited visits with David. The grandmother declined, stating that she preferred the existing visiting arrangement.
At about the same time, however, the grandmother asked DCF for permission to care for David and the mother in the grandmother's home. Over a protracted period of several months, DCF assessed the grandmother's qualifications. In March, 1998, DCF decided not to further consider the grandmother as a placement resource.[3] The grandmother had advised DCF that she had diabetes, asthma, an enlarged heart, chronic obstructive pulmonary disease, and difficulty climbing stairs, and long ago had had a nervous breakdown. DCF had observed the grandmother to be out of breath when playing with David. A psychological evaluation of the grandmother concluded that the grandmother's motive in offering to take David was in part to provide assistance to her daughter in hopes of seeing her recover and that the grandmother had ambivalence about raising David CT Page 1526 primarily on her own. DCF felt, in sum, that the grandmother was not capable of providing David the twenty-four hour supervision required in view of the mother's mental illness and limited parenting skills.[4]
On March 11, 1998, the Court ordered that visitation be reduced from six to three hours per week and that the grandmother may attend. The mother had not greatly benefitted [benefited] from the services that she had in her home. The visiting nurse assigned to assist the mother noted that the mother had made some progress but that the mother would still require twenty-four supervision to insure David's safety. A case worker with the KidSafe social service agency reported that, despite one hour per week of training from November, 1997 to March, 1998, the mother still did not independently initiate changing diapers, feeding the baby, or playing with him. The psychologist assigned to assist and evaluate the mother during this time period observed that the mother cared about her child but was passive and provided little emotional or physical interaction. Accordingly, the parties agreed that DCF would cease providing services at the visits.[5]
David was becoming very upset when he left his foster parents for a visit at his mother's apartment. Therefore, on May 5, 1998, the court switched the location of the visits to the foster home. From May 6, 1998 to July 16, 1998, the grandmother failed to attend the visits at the foster home. On July 16, both the mother and the grandmother attended the visit and had an argument in the child's presence. DCF then modified the grandmother's schedule so that visits would take place separately once a month at a local park. Those visits have taken place without incident. The grandmother has been affectionate and appropriate with David, although she has shown some physical limitations in following David around the playground and David has not shown any special attachment to her. Meanwhile, David's visits with his mother continue to reveal the mother's unresponsiveness and limited judgment about the child's needs.
David has thrived in his foster home. He is a normal, active boy approaching two years old. He calls his foster parents "Mom" and "Dad." The foster mother, who stays at home full time, and the foster father, who is a fireman, have provided a fully appropriate home for David. The foster parents' natural children, who are eleven and nine years old, enjoy David's company. David's foster parents wish to adopt him but would agree to have Ann E. CT Page 1527 remain as a grandmother in David's life and to let the mother visit.
The grandmother is currently sixty-four years old. She was born in England and trained as a nursery nurse. She came to this country in 1956, worked as a nanny, and then raised five children. She acquired a home in 1967, which she retains with a child's bedroom. She has two sons with their own families who live in the area. On May 30, 1997, the grandmother retired from eleven years of service with the Connecticut Department of Public Health. In early January, 1999, the grandmother slipped on ice and broke her ankle, necessitating her use of a walker at the conclusion of trial. The grandmother believes that David is not prospering in the foster home and that he should be raised by his biological family.
NEGLECT ADJUDICATION
The neglect petition alleges that, as of April 21, 1997, David was neglected in that, as provided in the relevant statute, he was "being denied proper care and attention, physically, educationally, emotionally or morally" and he was "being permitted to live under conditions, circumstances or associations injurious to his well-being." See Conn. Gen. Stat. §46b-120(8)(B), (C). An April 29, 1997 amendment to the petition adds the allegation that David was "uncared for" in that, under the relevant statutory definition, his mother's home cannot provide the "specialized care which the physical, emotional or mental condition of the child requires." See Conn. Gen. Stat. § 46b-120(9). DCF has the burden of proving these allegations by a fair preponderance of the evidence. See Practice Book §33-12.
The trial established that David was neglected within the meaning of the statute in that, at the time of David's birth, the mother failed to keep him fed, clothed, warm, and dry. The mother also threatened to kill herself, a threat that obviously posed a grave risk to the baby's welfare. Based on this evidence, DCF has proven that David was neglected and uncared for. See In re KellyS., 29 Conn. App. 600, 613 (1992) (uncared for statute requires only proof of ongoing parenting deficiencies and not actual incidents of abuse or neglect).
TERMINATION ADJUDICATION
CT Page 1528
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112(c)(1). In this case, DCF arranged for regular and lengthy visits with David with an extensive support network for the mother. DCF also facilitated the mother's continued mental health treatment. Based on these initiatives, which are detailed above, the court finds by clear and convincing evidence that DCF has made reasonable efforts to reunify David with his mother.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. § 17a-112(c)(3). General Statutes § 17a-112(c)(3) requires that, with one exception not pertinent here, these grounds must have existed for at least one year unless the court waives the one year requirement based on the standards set forth in § 17a-112(d).[6] In this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a). Because DCF obtained an amendment of its petition on September 15, 1998, that date becomes the adjudicatory date in this case.
The sole ground alleged in this case is that:
 the parent of a child under the age of seven years who is neglected or uncared for, has failed, is unable or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a petition filed by the Commissioner of Children and Families.
Conn. Gen. Stat. § 17a-112(c)(3)(E). No dispute exists about several of the elements of this ground. First, David is under CT Page 1529 seven years old. Second, the court has now found that David was neglected and uncared for as of November 19, 1997. Finally, it is undisputed that the mother's parental rights to her second child were terminated as a result of a DCF petition.
The remainder of the statute tracks the language of the traditional failure to rehabilitate statute. See Conn. Gen. Stat. § 17a-112(c)(3)(B). Thus it is appropriate to borrow the case law interpreting that language. This portion of the statute requires the court to analyze a parent's rehabilitation "as it relates to the needs of the particular child" and determine whether such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 167 (1989). The statute, however, does not require parents "to be able to assume full responsibility for a child, without the use of available support programs." In re Jessica M., 49 Conn. App. 229, 240 (1998) (internal citation omitted). Because of the requirement that the court predict what will happen within a "reasonable time" after the filing of the termination petition, it is sensible to conclude that the court can consider not only the parents' conduct before the filing of the termination petition, but also the conduct occurring after it.
The mother has already had to give up her first two children. When David was born, the mother initially neglected his basic needs and DCF had to take temporary custody. DCF then provided a panoply of assistance to the mother at the visits, including a psychologist. Despite this unusually high level of help over an extended period of time, and despite the mother's sincere desire to care for her child, the mother made only minimal progress in developing her parenting skills. While most of the time her mental illness caused her to remain unresponsive and withdrawn, there were also times, such as the time of David's birth or the mother's arrest, that the mother would act in irrational ways. The mother's schizophrenia is a chronic, long term disease that likely will limit the mother's parenting skills for the foreseeable future. This record leaves the court with no confidence that the mother will ever be able independently to attend to David's basic needs, much less provide him the type of stimulation that a growing child should have. DCF has therefore proven by clear and convincing evidence that, for more than one year, the mother has failed to rehabilitate herself.
THE MOTION TO TRANSFER GUARDIANSHIP
CT Page 1530
The mother, the grandmother, and DCF all agree that, if the court were to transfer guardianship to the grandmother, it should do so without terminating the mother's parental rights. Accordingly, it is appropriate to analyze the guardianship request at this juncture in the decision, before addressing the disposition of the termination petition. Because the grandmother has filed the motion, she bears the burden of proof in establishing by a preponderance of the evidence that the best interest of David warrants granting her motion.
The grandmother unquestionably has a vast amount of experience and training in raising children. There also can be no dispute that she loves David and has an understandable desire to keep him with his biological family.
The court, however, shares the concerns voiced by DCF about the grandmother's commitment to raising David, her motivation in seeking David's custody, and her ability to serve as his parent over the years. The grandmother gave up Keelin's first child for adoption. The grandmother was not involved in the custody of Keelin's second child, whom Keelin lost through termination. The grandmother declined to serve as a placement for David when he was born in April, 1997. Again in June, 1997, the grandmother turned down DCF's invitation to offer a plan for David. In November, 1997, the foster parents gave the grandmother an open invitation to come to their home for visits with David, but the grandmother took advantage of this opportunity only once, and that was not until July, 1998. To be sure, the grandmother has had valid reasons for her decisions, with the exception of failing to visit David's foster home until July, 1998. But the totality of this history reveals a certain lack of commitment on the grandmother's part to taking care of Keelin's children.[7]
The court also credits the psychological evidence suggesting that the grandmother's real motivation in seeking guardianship is not so much a pure desire to raise David as it is to help Keelin and that the grandmother is in reality ambivalent about raising David primarily on her own. At trial, the grandmother testified to another reason for seeking a transfer of guardianship that David is not prospering in his foster home. The grandmother went so far as to suggest that the foster mother was manipulative, that the foster parents were responsible for certain unusual bruises that David displayed, and that David views his foster parents merely as care takers. The court, however, rejects this broad-based attack on the foster parents. The court finds that CT Page 1531 David is a normal, active, and growing boy who will necessarily have minor injuries as he learns to walk and run, that the foster parents have rendered fully appropriate care to David, and that the foster parents have shown commendable insight in keeping the doors open to David's biological family, especially given the apparent suspicion with which the grandmother views them.
Finally, the court questions the physical ability of the grandmother to raise David until he reaches the age of majority. Even for healthy young parents, raising a two year child to adulthood is an exhausting undertaking. For the grandmother it would be particularly difficult. Without disputing the testimony of Dr. Rodgers that the grandmother is in good health, the court finds that the grandmother is not a youthful or spry sixty-four year old person. The trial established that the grandmother had some limitations in playing with David. She now has a broken ankle and, while presumably her recovery will be routine, her age does create some uncertainty on this point. Although she has two sons and Keelin in the area, responsibility for raising David would fall primarily on her alone. The court is not persuaded that the grandmother is fully up to the task. David, for his part, would not have siblings to play with, as he does in the foster home. For all these reasons, the court finds that the grandmother did not carry her burden in establishing that the best interest of David warrants transfer of his guardianship to the grandmother.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112(c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The best interest of David E. clearly and convincingly requires termination of the parental rights of Keelin E. Despite her good intentions, Keelin has not developed the parenting skills necessary to keep David safe, much less stimulated. Keelin's cause does not benefit from the grandmother's motion for transfer of guardianship because the court has found that the best interest of David does not warrant his placement with the grandmother. On the contrary, the best interest of David favors continued placement with the current foster family. David has CT Page 1532 bonded with his foster parents, he has siblings to play with, and in all respects the foster parents have provided him a home where he can thrive. David will also benefit from the permanency that termination provides. See In re Juvenile Appeal (83-CD),189 Conn. 276, 292 (1983).
In arriving at a decision, the Court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112(e). See In re Tabitha P.,39 Conn. App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF provided foster care for David and offered Keelin regular and lengthy visitation. DCF also provided an extensive array of support services to assist Keelin in improving her parenting skills and facilitated her continued mental health treatment. These services were relevant to Keelin's needs and were offered in a timely manner.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF offered the mother appropriate services and guidance, and sufficient time to permit family reunification.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
On April 21, 1997, at the time of the order of temporary custody, the Court approved the following preliminary specific steps for Keelin to follow: (1) keep all appointments set by or with DCF and cooperate with DCF announced or unannounced home visits, (2) keep whereabouts known to DCF and your attorney, (3) participate in individual counseling and parent education services, (4) follow recommendations of a psychiatrist and other involved persons at Inter Community Mental Health Services, S) accept and cooperate with in home services referred by DCF, 6) CT Page 1533 sign releases authorizing DCF to communicate with service providers to monitor attendance, cooperation, and progress, and 7) continue taking prescribed medication. The mother substantially complied with these specific steps. As detailed above, DCF substantially met its obligation to provide assistance.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, David is bonded to his foster family. David is not strongly attached to his mother.
5) The age of the child.
David will be two years old on April 13, 1999.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interests of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the Court finds that the mother has maintained regular visitation with David and has cooperated with the generous provision of services by DCF designed to improve her parenting skills. Unfortunately, the mother has not benefitted [benefited] significantly from these services.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As discussed above, the mother's difficulties stem from her own limitations and not from outside interference or economic circumstances. CT Page 1534
THE VISITATION MOTIONS
The court sees no particular benefit to ordering increased visitation by the grandmother at this juncture. For one thing, the grandmother's unjustified distrust of the foster parents does not help her cause. Second, any visitation change would only be effective until adoption, which presumably will be in the near future. At that point, visitation decisions will lie within the discretion of the adoptive parents. The court believes it best not to order any changes in the existing visitation arrangements during this interim period so as to facilitate a smooth transition into the next phase. Accordingly, the grandmother's motions for increased visitation are denied.
The court, however, does not mean to suggest that it disfavors any increased visitation arrangements that the parties can agree upon. The court is encouraged by the foster mother's expressed willingness to have Ann E. remain as a grandmother in David's life and to let the mother visit after adoption. This court is "not prepared to assume that the welfare of children is best served by a narrow definition of those whom [it] permit[s] to continue to manifest their deep concern for [their] child[ren]'s growth and development." Michaud v. Wawruck,209 Conn. 407, 415 (1988).
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interest of David E. for a termination of parental rights to enter with respect to the mother, Keelin E., and to deny the motions of the grandmother, Ann E., for transfer of guardianship and increased visitation. Accordingly, the court hereby grants the neglect and termination petitions and denies the grandmother's motions.
DCF did not present any evidence about efforts to locate the father. The court is reluctant to appoint the Commissioner of DCF as statutory parent for David until it is reasonably certain that David's biological father has no interest in these proceedings. The court would suggest that DCF publish a legal notice to the father and then schedule a short court hearing to establish, if appropriate, that no one has responded to the notice. If it can establish this fact, then the court would be inclined to issue final orders in this case. CT Page 1535
It is so ordered.
___________________________ Carl J. Schuman Judge, Superior Court