Memorandum of Decision
This is the sad case of five neglected children, four of whom have drifted through numerous foster homes and other placements, three of whom were physically abused, and two of whom remain in psychiatric hospitals.
On June 10, 1997, the Department of Children and Families (DCF) filed petitions to terminate the parental rights of Michelle B. and Terrance M. to their children, Anthony M., Brittany M., Thomas M., and Shaquanna M., and to terminate the parental rights of Michelle B. and Frederick H., (hereinafter Mr. H.) to their son, Frederick H., III (hereinafter Frederick). On September 18, 1997, the court accepted the consent of Terrance M. to the termination of parental rights to his four children. On July 8, 1998, the mother filed petitions to revoke her children's commitment to DCF, which expires July 27, 1999. A consolidated trial of the termination and the revocation petitions took place on October 28, 29, and 30, November 19, and December 11, 1998, and January 27 and February 11, 1999.[2] For the reasons stated below, the court grants the petition to terminate the parental rights of Mr. H., grants the petitions to terminate the mothers rights to Anthony, Thomas, and Frederick, and denies the petitions to revoke the commitments of these three boys. The court defers ruling on the petitions to revoke the commitments of Brittany and Shaquanna and on the disposition of the petitions to terminate the mothers rights to these two girls.[3]
FACTS
The court finds the following facts and credits the following evidence.[4]
A. The Mother
CT Page 4025
Michelle B. turned twenty-nine years old during the trial. At age sixteen, Michelle became pregnant through a nonmarital relationship with Terrance M. and dropped out of high school. On February 3, 1987, Anthony M. was born. Despite her youth, Michelle soon went on to have three more children with Terrance: Brittany M., born on March 15, 1988; Thomas M., on November 10, 1989; and Shaquanna, on July 14, 1991.
Domestic violence pervaded the relationship between Michelle and Terrance. In late 1991, when Brittany was three or four years old, Terrance turned on her and beat her with a hanger. Michelle reported the beating to DCF. Michelle's relationship with Terrance ended in March, 1992.
Soon thereafter, the mother got into a relationship with Mr. H. Together they had a baby boy, Frederick, on March 2, 1993. But the relationship between Michelle and Mr. H. was also abusive. In early June, 1993, Mr. H. beat both Michelle and Thomas, the latter in part because he supposedly looked like Terrance M. The mother and children temporarily went into a battered women's shelter based on a referral from DCF. Mr. H. was convicted of assault and imprisoned. In December, 1993, Thomas was admitted to a hospital psychiatric unit for a short stay after he set a fire.
On March 2, 1994, the court adjudicated Thomas to be abused and the other four children to be neglected. The court placed the children with the mother under DCF protective supervision and entered expectations. DCF arranged for Klingberg Family Preservation Services to come into the home for several months. Thomas, however, continued to act out, on occasion in violent ways. Thomas was examined several times at psychiatric hospitals. The mother did not consistently participate in services offered by the Newington Children's Hospital. Overwhelmed by Thomas behaviors, the mother agreed to placement of Thomas in a therapeutic foster home. On August 15, 1994, the court, after a hearing, granted DCF an order of temporary custody of Thomas. DCF placed Thomas with Katherine G.,[5] who ran a specialized foster care home supervised by the Village for Families and Children (hereinafter the Village). During this time period, DCF also provided the mother with a parent aide and domestic violence counseling, but the mother did not carry through with this assistance. On October 6, 1994, the court modified the disposition of the neglect petition concerning Thomas by committing him to DCF for eighteen months. CT Page 4026
In September, 1994, the mother became involved with a man named Kian W. She and the children gave up many of their belongings to move with him into the neighborhood of a gang in which Kian was a participant. The mother failed to maintain contact with DCF during this period. In December, 1994, the mother called DCF because Klan had assaulted her. It is not clear whether the children saw or heard the assault but it is clear that the children, except for Thomas, saw the mother after she was beaten. The mother was hospitalized for a day.
On January 27, 1995, the court modified the disposition of the four other neglect petitions by committing Anthony, Brittany, Shaquanna, and Frederick to DCF. DCF placed Anthony with Thomas in Katherine G's foster home and Brittany, Shaquanna, and Frederick with their maternal aunt, Denise B. The task of caring for the latter three, however, proved overwhelming for the aunt. In May, 1995, DCF placed Frederick in the foster home of Evelyn D., and placed the two girls in other foster homes within the Village system. Of the five children, only Frederick remains in the placement in which he was at the end of May, 1995.
At DCF's request, Dr. David Mantell, a clinical psychologist, evaluated the mother in 1994 and the children in 1994, 1995, and February, 1996.[6] Dr. Mantell found that the mother was sexually abused as a child, left school after the eleventh grade, had low average intelligence, and showed personality disorders with a history of antisocial features, immaturity and impulsively, and dysthymia. Dr. Mantell described the children as "very challenging." He found that all but Frederick were significantly at risk for a variety of behavioral, emotional, social, and educational problems and that they needed intensive therapeutic and educational care including well-structured, attentive environments.
For about a month in early 1995, the mother, without notifying DCF, entered the Interval House, which was a safe house for battered women. The mother apparently entered the Interval House again in March, 1995, but was discharged for failure to cooperate. In the summer of 1995, DCF instituted a reunification program at the Village in an effort to place all services under that agency. The mother signed a service agreement with DCF in which she agreed, among other things, to cooperate with the Village regarding the children's therapy. By August, 1995, the mother completed a parenting class at the Village and demonstrated CT Page 4027 improvement and motivation in individual therapy. The Village assigned the mother a social worker to assist with reunification.
Weekly visitation of the children began in October, 1995. An initial visit with all five children present proved chaotic. The staff then divided the children into two and then three groups and held multiple weekly sessions totaling five hours per week. The mothers social worker would observe the mother from an observation room, tape the visits, and then, along with others, meet with the mother to discuss improving her parenting skills. The staff had several concerns. First, the mother would either ignore some of the children's demands or have difficulty setting limits for their behavior. Second, the children, particularly Anthony and Thomas, were angry at the mother for being away from them or for not keeping them safe and the mother was unable to take responsibility for their predicament.
After six months, the Village staff concluded that the mother was not benefitting [benefiting] from the reunification program. The staff recognized that the children were difficult, but concluded that the mother did not implement the advice that they gave her. The staffs central concern was that the mother could not appropriately discipline the children and that they would not be safe in her house. In addition, Thomas told his therapist that he did not want to see his mother anymore. In April, 1996, the Village recommended to DCF that they end reunification services and pursue permanency planning.
DCF did not accept this recommendation. It decided to continue visits and, essentially, give the mother additional time. Visits resumed first at the DCF office in Hartford. The mother, often accompanied by the paternal grandmother, occasionally brought toys or food for the children. DCF then allowed the visits to take place at the mothers home. At home, the visits became more productive because there was more space and the mother had more control of the environment.[7]
Anthony and Thomas, however, no longer wished to see their mother. Their therapists at the Village recommended against further visitation. Thomas, in particular, would behave aggressively after a visit. He was angry about and fearful of violence at the mother's home. In the latter part of 1996, DCF discontinued visitation with Anthony and Thomas, although it continued to permit weekly phone calls with them. CT Page 4028
In December, 1995, the mother began a relationship with Tyrone M. The relationship went well and at no point during the relationship did he abuse her. He attended several of the mothers visits with her children and was fully appropriate. Tyrone left a favorable impression with several of the witnesses in this case, including two from DCF. As late as November, 1996, DCF believed that Tyrone should become part of the mothers reunification plan.
DCF knew several things about Tyrone from early on. First, he himself had a child in DCF custody. Second, he was recovering from a drug addiction. For some reason, however, they did not know whether he had a criminal record. It appears that not until late 1996 did DCF request his conviction record. On February 19, 1997, DCF learned that Tyrone had approximately ten prior convictions, including a probation violation, several assault convictions, and a conviction for risk of injury to minors. He had been to prison several times and had been on probation since March, 1995. DCF immediately decided to suspend the mothers reunification plan.[8]
The mother apparently first learned that Tyrone had a criminal record when he told her in January, 1997 that he had been convicted for hitting an ex-girlfriend in the face. She then learned about the risk of injury conviction when Tyrone actually introduced her to the minor victim. On February 20, 1997, DCF informed the mother of the full extent of Tyrone's record, including a recent conviction for assaulting and choking his wife. In early March, 1997, the mother ended her living relationship with Tyrone. She informed DCF that he is "no longer sober" and was living elsewhere in Hartford using drugs. She claimed that Tyrone had not been honest with her and had kept many of his criminal charges secret.[9]
The mother has nonetheless remained friends with Tyrone and sees him once in a while. She testified at trial that Tyrone is "someone who will always be there" for her. She added that she does not see Tyrone M. as a threat to her or her children, although she would not allow him to have access to them.
In April, 1997, DCF advised the mother that it intended to file for termination of parental rights. Of prime concern was the mothers relationship with Tyrone M. and her prior history of domestic violence. Also of importance was the fact that the mother had not internalized the counseling she had received regarding parenting skills. DCF developed a related concern that CT Page 4029 the mother was making inappropriate comments to her children about the possibility of going home with her or about the quality of foster care. DCF accordingly informed the mother in writing that she was not to give the children mixed messages about DCF's plans to seek termination and that weekly phone calls with the children would be monitored by Village personnel. At about the same time, DCF changed the location of the visits back to the DCF office in Hartford.
Starting in January, 1997, DCF had also become troubled by the fact that the mother would have other adults, such as Tyrone M. or the paternal grandmother, accompany her to the visits. DCF felt that the presence of these other adults made it more difficult for the mother and the children to build a relationship with each other. On several occasions DCF advised the mother in writing not to bring friends and relatives to visit. The mother continued to disregard DCF policy. In late May, the mother ultimately indicated that she would not comply. DCF accordingly suspended further visitation.
At trial, Michelle B. testified and admitted that she had made mistakes as a young mother by getting into abusive relationships. The mother acknowledged that she had gone into domestic violence shelters on four occasions and attended programs there about domestic violence. She claimed that she is ready now to put her children first and does not need a man. She believes that Brittany, Shaquanna, and Frederick have expressed a desire to come home to her and that she "goes by what the kids have to say and not by what the therapists say." The mother realizes that Anthony and Thomas resent her because of their tumultuous upbringing but believes that their feelings are a product of their foster care, DCF mistakes, and what the therapists have said. The mother has an apartment, but did not present any evidence of employment or income.
B. The Father
While Mr. H. was in prison for assaulting Thomas and the mother, Frederick visited his father on one occasion. Frederick was traumatized by the experience and DCF accordingly discontinued visits. Mr. H. has not maintained any other form of contact with Frederick and has not provided for him in any way.
DCF last heard from Mr. H. in February, 1997. He was apparently released from prison in early 1997 and placed on CT Page 4030 probation. His probation officer reported Mr. H. missing in March, 1997 and obtained a warrant for his arrest. The court entered a default against him on the termination petition on May 5, 1998. He failed to appear for this trial.
C. Anthony and Thomas 1. The Foster Home of Katherine G.[10]
The placement of Thomas and Anthony in the home of Katherine G. ultimately became a nightmare come true. The home was both a state licensed family day care facility and a specialized foster home, approved by the Village, for difficult foster children. Ms. G. had provided such services on a regular basis since at least the early 1990's. DCF had the responsibility to supervise the Village in its placement of children within its system and conduct investigations of matters referred to it.
Thomas arrived in the G. home on August 31, 1994. By the end of April, 1995, there were four reports from Thomas's school of their observations or Thomas's claims of physical injury. Thomas denied that Ms. G. had anything to do with these injuries. DCF or the police investigated these reports with inconclusive results. DCF proceeded to place Anthony in the G. home on May 23, 1995.
Because of disagreements between Thomas's school and the Village concerning the existence of and responsibility for some of Thomas's claimed injuries, Thomas started a new school on September 4, 1996. In January, 1997, the new school called DCF to report that Thomas had large strap-like marks on his back. Thomas claimed at the time that he had fallen off his bicycle and investigation at that point proved inconclusive.
As the Village's reunification program for the mother failed, and the Village began to support termination, Ms. G expressed an interest in adopting Thomas and Anthony. A tragic incident in February, 1997, changed these plans. On February 24, 1997, Reagan M., a two year old in Katherine G's day care program, died under suspicious circumstances. A homicide investigation ensued and Ms. G was charged with manslaughter. Those charges are currently pending.
Subsequent investigation by the Office of the Child Advocate revealed that seven of a total of twenty-nine children in Ms. G's day care program were alleged to have been injured, although only two of these cases were reported to DCF. At the time of Reagan CT Page 4031 M's death, however, DCF did have a file with fifteen previous referrals alleging physical abuse by Ms. G. It is not clear whether these reports dealt with day care children or foster children. DCF workers at trial admitted that DCF's quality assurance with respect to the G. home was not good and that Thomas was in fact abused in the G. home.[11] The Office of the Child Advocate report found more specifically that DCF had defective licensing procedures, insufficient screening of prospective foster parents, poor reporting of suspected child abuse and neglect by DCF workers and those they trained to report abuse, inadequate record-keeping, and incomplete investigations.
 2. From February, 1997 to the Present
On February 25, 1997, DCF removed Anthony and Thomas from the G. home. The odyssey for these two boys, however, was far from over. Anthony, distressed about being separated from his foster home and traumatized by the violence that took place there, then went through a series of six specialized foster placements and short hospital stays. For Thomas, the total was seven.
Anthony was admitted to the Riverview Hospital for Children and Youth, a state psychiatric hospital, on January 21, 1998. As of the time of trial, he remained there. His diagnosis is post traumatic stress disorder, disruptive disorder, and attention deficit hyperactivity disorder. He has been suicidal and has engaged in self-destructive behaviors.
Anthony rarely mentions his mother. He has said that he does not wish to see her. Initially he blamed Thomas for their removal from the Village. He now refers to his brothers and sisters as his family. He sees Thomas once a week but has shown unreasonable expectations of him, parentified behaviors, and intolerance. He and Thomas receive visits with Brittany, Shaquanna, and Frederick once a month.
Anthony has said that he does not wish to be adopted and is probably not adoptable given his age and mental health. He also rejects being in a family setting. The plan for Anthony is to place him in a residential group home.
Thomas was admitted to Riverview on October 21, 1997 as a result of oppositionality, uncontrollable physical aggression, primitive behaviors, and inappropriate sexual acts. According to CT Page 4032 one psychologist, Thomas felt responsible for what had happened to Reagan M. His initial diagnosis at Riverview was post traumatic stress disorder and attention deficit hyperactivity disorder. As of the time of trial he remained in Riverview. He had made progress, however, and had shown some positive behaviors such as caring for animals and sharing with other children.
Thomas is strongly connected to his siblings. Thomas has said he does not want to see or go back to his mother. He rarely talks about her. His focus is on being in a safe family environment. Thomas is probably not adoptable because of his behavioral profile. DCF's plan is to place Thomas in a professional foster home in which he would be the only child.
 D. Brittany and Shaquanna
Although not quite as dramatic as Anthony and Thomas's story, the plight of Brittany, now eleven years old, and Shaquanna, now seven and one-half, is also distressing. Both girls displayed aggressive behavior, and Brittany would engage in inappropriate sexual behavior, while in their aunts care in early 1995. Brittany then went to her first foster home. This placement ended in late 1996 because the foster parents could not handle Brittany's defiant behaviors and tantrums. A second foster placement failed in January, 1998 because of domestic violence in the home. Since that time, Brittany has been through four more placements including a short stay at Natchaug Hospital. In late October, 1998, Brittany was placed in the Connecticut Children's Place, which is a ninety day assessment center for children who have had difficulties with foster care. DCF's plan for Brittany was to find a residential treatment program and then perhaps a professional foster home. As of this writing, the court does not know whether Brittany has made the transition out of the assessment center.
At least until recently, Brittany's mental health declined while in placement. Her diagnosis includes oppositional defiant disorder, attention deficit hyperactivity disorder, post traumatic stress disorder, and dysthymia. Her behavior reflects exposure to trauma in childhood.
Brittany has regularly asked to see her mother and states that she wants to go home. She has said that she does not want to be adopted. At times, however, she seems torn and confused; one of her main concerns is whether her mother could keep her safe. CT Page 4033 Brittany realizes that her mother has made mistakes, but is very loyal to her and worries about her. During the summer of 1998, Brittany and her mother had a number of lengthy, though unauthorized telephone conversations. DCF then put Brittany on phone restriction.
After her stay with her aunt in the first part of 1995, Shaquanna went to a specialized foster home. DCF removed her in April, 1997 because there were too many children in the home and there were allegations of parental abuse. Shaquanna resided in a second foster home until June, 1998, but Shaquanna was difficult and at times destructive. She then went to a third foster home. DCF has put a number of services, such as a visiting nurse and a behavior specialist, into the new home, and Shaquanna has made progress. Shaquanna is now described as a sweet but difficult girl. She is diagnosed as having attention deficit hyperactivity disorder and post traumatic stress disorder.
Of the family members, Shaquanna is closest to Brittany. As of November, 1998, Shaquanna saw Brittany every day in a special school in which they were enrolled. Shaquanna does not talk about her mother as much as Brittany and, to the extent Shaquanna does, she may be influenced by Brittany. DCF's plan for Shaquanna is adoption. They have contracted with a professional child placement agency, which has found that several potential adoptive resources exist.[12] But DCF would also like to keep Shaquanna and Brittany together, and Brittany was not adoptable as of January, 1999.
 E. Frederick
Frederick is now six years old. He has been in the foster home of Evelyn D. since his initial placement in May, 1995. He has done well there. The most recent evidence is that he is bonded
The foster mother is in her sixties. She may not want to adopt Frederick but wishes to keep him for the long term. Frederick calls her "Nanna" although he sees her as a mother. The foster mother's son lives next door and plays with Frederick.
Until May, 1997, when DCF ended visitation, Frederick would see his mother regularly. At the end of several visits in late 1996, Frederick cried and did not want to leave. During this time period, Frederick frequently spoke to his mother on the phone CT Page 4034 because Evelyn would often call her. In February, 1998, DCF allowed the mother to visit with Frederick for his fifth birthday. The mother also accidently met Frederick and the foster mother at the supermarket in October, 1998. In all these encounters, Frederick and the mother have gotten along well.
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112 (c)(1).[13] In this case, DCF made reasonable efforts, if not more, to reunify the mother with her children through the extensive reunification program at the Village. When that program failed, DCF pursued reunification on its own. The mother simply was unwilling or unable to benefit from these efforts. DCF has made reasonable efforts to locate Mr. H., but he has failed to appear. The court finds by clear and convincing evidence that DCF has met its threshold burden.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. § 17a-112 (c)(3).[14] General Statutes § 17a-112 (c) (3) requires that, with one exception not pertinent here, these grounds must have existed for at least one year unless the court waives the one year requirement based on the standards set forth in § 17a-112 (d). In this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a). Because DCF obtained an amendment of the petitions on October 8, 1998, that date becomes the adjudicatory date in this case.
DCF in this case has alleged the grounds of abandonment, failure to rehabilitate, and lack of an ongoing parent-child relationship with regard to both parents. The court finds that DCF has proven its allegations by clear and convincing evidence CT Page 4035 except for the allegation of abandonment against the mother, the allegation of no ongoing relationship against the father, and the allegation of no ongoing relationship against the mother with respect to Brittany, Shaquanna, and Frederick.
 1. Abandonment
General Statutes § 17a-112 (c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In reMigdalia M., 6 Conn. App. 194, 208-209, cert. denied,199 Conn. 809 (1986). Conversely, "where a parent falls to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id. at 210.
Mr. H., the father of Frederick, did not sustain this continuing, reasonable degree of concern. While the father was in prison, Frederick visited him once and then DCF discontinued visits. Since that time, the father has not maintained communications with his son and has not provided for him. The father cut himself off from a source of information about Frederick by failing to contact DCF from February, 1997 on. Based on this showing, DCF has proven by clear and convincing evidence that Mr. H abandoned Frederick for a period of more than one year before the adjudicatory date.
The mother's case is different. From mid-1995 on, the mother has maintained contact with DCF and her children to the extent that DCF has permitted. She has had food and toys for the children. It is true that the mother did not supervise her children well during the visits and that she did not follow DCF's directions concerning the presence of other adults at the visits. But in her own, perhaps misguided way, the mother has shown that she is very interested in her children. She is perhaps guilty of excessive contact with the children rather than insufficient contact. The evidence is not clear and convincing that the mother has abandoned her children. CT Page 4036
 2. Failure to Rehabilitate
A second statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(C). No dispute exists that the court adjudicated all five children neglected on March 24, 1994, thus satisfying one element of the statute.
The rest of the statute requires the court to find whether the parent has achieved "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(C). The statute requires the court to analyze the parents rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable "within a reasonable time." Inre Luis C., 210 Conn. 157, 167 (1989). The statute, however, does not require parents "to be able to assume full responsibility for a child, without the use of available support programs." In reJessica M., 49 Conn. App. 229, 240 (1998) (internal citation omitted). Because of the requirement that the court predict what will happen within a "reasonable time" after the filing of the termination petition, it is sensible to conclude that the court can consider not only the parents conduct before the filing of the termination petition, but also the conduct occurring after it.
The case against Mr. H is straightforward. For the last several years, he has had no role in Frederick's life. He has failed to maintain contact with DCF. He failed to appear for a preliminary hearing on the termination petition and then failed to appear for trial. The evidence is clear and convincing that he has failed to rehabilitate himself for a period of over one year.
The mothers case requires more discussion. The mother did visit the children regularly in foster care. From 1995 on, she participated in the rehabilitation programs (although not the psychological evaluations) to which DCF referred her. The mothers CT Page 4037 failure is that she did not benefit from these programs. After six months of the Village's intensive reunification program, the mother still lacked the ability to keep her children orderly and safe. Anthony and Thomas no longer wished to see their mother. When DCF then gave the mother more time to improve her parenting skills, the mother wasted this opportunity by bringing additional adults to the visits contrary to DCF's legitimate requests and by sending inappropriate messages to the children about the possibility of coming home. After DCF explicitly prohibited such messages, the mother participated in unauthorized phone conversations with Brittany.
By the spring of 1995, the mother had had three abusive relationships, gone into battered women's shelters on four occasions, attended programs there on domestic violence, and had been offered additional counseling through DCF. Notwithstanding this background and experience, the mother began a relationship in December, 1995 with Tyrone M., a man with ten prior convictions, including at least three involving the victimization of women or children. Fortunately, the mother was not physically harmed or abused during this relationship. But what we now know in hindsight does not justify the risk that the mother took by entering into the relationship in the first place.
The mother has argued that neither DCF nor she knew about Tyrone's past. As for DCF, the court finds that its failure to obtain Tyrone M's criminal record until February, 1997 was inexcusable. Wholly apart from Tyrone's relationship with the mother in this case, the fact that Tyrone himself had a child in DCF custody and that DCF knew that Tyrone had a drug addiction makes DCF's inability to procure his criminal record sooner a dereliction of its duty to children and families.
DCF's misfeasance, however, does not relieve the mother of her responsibilities. It is true that the mother had a good relationship with Tyrone, that Tyrone left a favorable impression with DCF, and that Tyrone concealed his criminal past. But given the mothers ugly experience with domestic violence and her counseling from the shelters, she should have been especially probing about the background of, and especially cautious about, any man whom she considered bringing into her life. While the court recognizes that the mother was not a police detective, the court cannot accept the notion that full inquiry by her into Tyrone's past, which included several prison sentences, a pending probation term, drug addiction, and a son in DCF custody, would CT Page 4038 not at least have given her some suspicions that she was becoming involved with the same type of man that had caused her so much harm in the past. The much more logical conclusion is that the mother had simply failed to learn, from her past experience and from the guidance she received in the shelters, about the nature of domestic violence. For this reason, and for those stated above, the court finds that DCF has proven by clear and convincing evidence that for a period of more than one year before the adjudicatory date the mother has failed to rehabilitate.
 3. No Ongoing Relationship
The third statutory ground alleged in this case is that there is "no ongoing parent-child relationship, which means the relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(D). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re Juvenile Appeal(Anonymous), 181 Conn. 638, 645 (1980) (internal citation omitted). "In either case the ultimate question is whether the child has no present memories or feelings for the natural parent." Id. at 646.
In the present case, DCF failed to present evidence on whether Frederick has present memories or positive feelings for Mr. H. Given Mr. H's long-standing abandonment of his child, the court assumes that Frederick has no present memories or positive feelings for his father. But the court must rest its decision on evidence, not assumptions, and DCF has the burden of producing that evidence. Because DCF did not do so, the court finds that it did not prove the ground of lack of an ongoing parent-child relationship against the father.
In the mother's case, the evidence reveals that, for at least one year before the adjudicatory date, Anthony and Thomas had no positive feelings for their mother. Thomas, in particular, has frightening memories of the violence in the mothers home. Indeed, CT Page 4039 both children have post traumatic stress disorder stemming at least in part from their tumultuous childhood with their mother.[15] To allow further time for the reestablishment of a parent-child relationship would not be in the best interest of these two boys given their demanding special needs and the fact that they still show no interest in seeing their mother. This evidence clearly and convincingly establishes the lack of an ongoing parent-child relationship between the mother and Anthony and Thomas.
Brittany most consistently has expressed a desire to see and return to her mother. It is possible that in reality she has mixed feelings, but the court certainly cannot say that the evidence clearly and convincingly demonstrates the absence of positive feelings towards her mother. Shaquanna is perhaps more ambivalent about her mother, but here again DCF has not satisfied the clear and convincing standard. Frederick, although comfortable in his foster home, seems to have had a good relationship with his mother over the years. For these reasons, the court finds that DCF has not proven by clear and convincing evidence the lack of an ongoing parent-child relationship between the mother and Brittany, Shaquanna, and Frederick.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The mother's petition to revoke the current commitment is logically related to this inquiry. The mother has the burden of proving by a preponderance of the evidence that the cause for commitment no longer exists. If she meets this burden, then DCF must prove by a preponderance of the evidence that it would not be in the best interest of the child to be returned to the mother. See In re Thomas L., 4 Conn. App. 56, 57 (1985); Practice Book § 33-10.
 A. Anthony and Thomas
One of the troubling questions in this case is whether, given the abuse that Anthony and Thomas experienced or observed in the foster home of Katherine G., DCF rather than the mother should be CT Page 4040 held responsible for the boys current psychiatric condition. As stated above, see note 15 supra, both boys came into the foster care system damaged by the violence perpetrated by the mothers boyfriends. This experience contributed to their current makeup. On the other hand, while DCF did not directly cause the abuse in Katherine G's foster home, DCFs poor oversight of that home allowed it to happen. Thus neither the mother nor DCF can abjure at least partial responsibility for the boys current condition.
Anthony and Thomas do not wish to be reunited with their mother. They remain in a psychiatric hospital with profound special needs. The mother is not equipped to meet those needs. She did not significantly improve her parenting skills during the period prior to the filing of the termination petitions when the Village and DCF attempted to work with her. The more current evidence of the mothers capabilities is her testimony in court on January 27 and February 11, 1999. The mother impressed the court as immature, cynical, and lacking in insight. She did not follow the courts instructions and directions to answer questions responsively. Although she took some responsibility for mistakes as a young mother, she was too quick to blame others — the police, DCF, the therapists — for her own actions and omissions. She did not provide any evidence that she is employed.
It is true that termination of rights to Anthony and Thomas will not serve its usual purpose of making children available for adoption, because Anthony and Thomas are probably no longer adoptable. But given that the boys do not wish to return to the mother and that the mother is not equipped to handle their needs, there is no basis to consider reunification. As several therapists testified, termination would allow these two troubled boys to put their unpleasant past behind them and move on to the possibility of a new family. Even if they are not adoptable, they stand a greater chance of being stable in DCF's care than in the mothers care. The court finds that the best interest of Anthony and Thomas favor termination of the mothers rights and continued commitment to DCF.
 B. Brittany and Shaquanna
The fate of Brittany and Shaquanna poses a dilemma. Shaquanna is adoptable, especially if the granting of termination eliminated the legal risk confronting pre-adoptive parents. Termination and adoption might well be in Shaquanna's best interest given her special needs, her recent adjustment to foster CT Page 4041 care, and her limited attachment to her mother. But even DCF agrees that the best of interest of Shaquanna favors her staying with Brittany, and Brittany is not adoptable. Further, Brittany has most consistently expressed the desire to be reunited with her mother. Thus, based on the evidence at trial, neither complete termination nor complete reunification provides a satisfactory solution for these girls.
Because of the protracted nature of this trial, the most recent information that the court has regarding these girls comes from testimony provided on November 19, 1998. At that time, Brittany was about thirty days into a ninety day placement for assessment. The court does not know where she is now. The court also does not know how Shaquanna is currently faring in her most recent foster placement. Given the nomadic experience that these girls have had with placements while in DCF custody, and Brittany's concededly temporary status in an assessment center, the status of these girls may well have changed since November 19.
Indeed, on March 22, 1999, the mother filed a motion requesting an additional evidentiary hearing in that "there has been a significant change in the placement of Brittany and Shaquanna." Given the current uncertainty, the court cannot ignore this possible development. The court accordingly grants the motion for an additional evidentiary hearing and defers a ruling on the petitions to revoke the commitments of Brittany and Shaquanna and on the disposition of the petitions to terminate the mothers rights to these two girls.[16]
 C. Frederick
Frederick has been in the same foster home for almost four years. He has lived about two years more with his foster mother than his natural mother. He has adjusted well to the foster home, has bonded to his foster mother, and would like to stay there. At the same time, Frederick has a good relationship with his natural mother.
Reunification with the natural mother is not a reasonable goal in this case. Frederick has been in a stable environment for too long to reverse directions. The reverse direction, moreover, is not a stable one. The natural mother is immature, she does not have a secure economic footing, and she retains a friendship with Tyrone M., who has a disturbing past record for domestic abuse. CT Page 4042 For these reasons, the petition to revoke the commitment is denied.
Although the foster mother has expressed some reluctance about adopting, she does want to keep Frederick for the long term. It is possible that termination of the mothers rights may make adoption more attractive to the foster mother. In any event, even if the foster mother does not adopt, Frederick, who has lived in uncertainty about his mothers status for four years, is entitled to the permanency that termination provides. See In reJuvenile Appeal (83-CD), 189 Conn. 276, 292 (1983). The court, for all these reasons, finds that termination of the mothers parental rights is clearly and convincingly in Frederick's best interest. Because the father, Mr. H., has been a complete stranger in Frederick's life for the last several years, and appears to be a fugitive from justice, termination of his parental rights is clearly and convincingly warranted as well.
Given that the court has decided to grant the termination petition, it cannot order visitation. The court nonetheless encourages DCF and the foster mother to allow appropriate visitation, because Frederick does have a good relationship with his mother. This court is "not prepared to assume that the welfare of children is best served by a narrow definition of those whom [it] permit[s] to continue to manifest their deep concern for [their] child[ren]'s growth and development." Michaudv. Wawruck, 209 Conn. 407, 415 (1988).
 D. Required Findings
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112 (e). See In re Tabitha P.,39 Conn. App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF provided foster care for the five children and offered the mother regular visitation. DCF also arranged for the extensive reunification program at the Village and then, when that failed, provided its own reunification program for the mother. These services were relevant to the mothers needs and were offered in a CT Page 4043 timely manner. DCF was unable to provide services to Mr. H. because he was in prison and then his whereabouts became unknown.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF offered the mother appropriate services and guidance, and sufficient time to permit family reunification.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
At the time of the neglect adjudications, the court entered the following expectations for the mother to meet: (1) keep all appointments set by or with DCF, (2) keep whereabouts known to DCF and your attorney, (3) participate in individual and family counseling, (4) respect the conditions of the restraining order, 5) attend Parents Anonymous groups and cooperate with a parent aid, 6) visit the children on a regular basis, and 7) secure adequate housing. As detailed above, the mothers compliance with these expectations was fair at best and she did not particularly benefit from the services that she obtained. DCF substantially met its obligation to provide assistance except for its faulty oversight of the foster home of Catherine G. and its failure to obtain Tyrone M's record in a timely fashion.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, Anthony and Thomas have no emotional ties to their mother and are currently in a psychiatric hospital. Brittany has an attachment to her mother and none to any foster family. Shaquanna's attachment to her mother is uncertain and, as of the time of trial, she was in a relatively new foster home. Frederick has bonded with his foster mother. He retains a good relationship with his mother but has no emotional ties to his father. CT Page 4044
5) The age of the child.
Anthony is twelve, Brittany is eleven, Thomas is nine, Shaquanna is seven and one-half, and Frederick is six.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that, particularly from mid-1995 on, the mother maintained contact with her children and their care takers to the extent that DCF permitted and sometimes engaged in unauthorized contact. The mother, however, did not improve her parenting skills or adjust her living circumstances to point where she could meet the ordinary and special needs of her children. Mr. H. has made no efforts to adjust his circumstances to meet Frederick's needs.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As discussed above, the mothers partners have been abusive. But after freeing herself from one abusive relationship the mother would get into another or, in the case of Tyrone M., another with the significant potential for domestic violence. Thus any interference with the relationship to her children caused by domestic violence is largely of the mothers own making, especially given that she has received counseling for this problem. The shocking abuse that Anthony and Thomas were exposed to or experienced in the foster home of Katherine G. is, of course, not the mothers fault but, as stated, Anthony and Thomas came into foster care damaged from domestic violence in the mothers home.
CONCLUSION
CT Page 4045
Based upon the foregoing findings, the court determines that it is in the best interest of Anthony M., Thomas M., and Frederick H., III for a termination of parental rights to enter with respect to the mother, Michelle B. Given the consent of Terrance M. to the termination of his rights to Anthony M. and Thomas M., and the finding that it is in the best interest of Frederick H., III for termination to enter with respect to the father, Frederick H., the court hereby orders that judgment enter terminating all parental rights to Anthony M., Thomas M., and Frederick H., III. The petitions to revoke the commitment of these three boys are denied. The court further orders that the Commissioner of DCF is appointed statutory parent for Anthony M., Thomas M., and Frederick H., Ill. If the foster mother is willing to adopt Frederick H., III, it is the courts direction that she receive first consideration. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
Pending a further hearing, the court defers a ruling on the petitions to revoke the commitments of Brittany M. and Shaquanna M. and on the disposition of the petitions to terminate the rights of Michelle B. to these two girls.
It is so ordered.
Carl J. Schuman Judge, Superior Court
[2] This trial was bifurcated due to the failure of the parties to complete the trial within their original estimate of three days. Bifurcation of a court trial imposes a hardship on the court, which sits as finder of fact. In this case, moreover, several therapists testified on the third day of trial that the pendency of termination proceedings was creating anxiety in some of the children in this case. Unfortunately, the parties overlooked these concerns.
[3] The three boys were originally represented by Attorney Charlotte McChord, but, sadly, Ms. McChord died in early January, 1999. Throughout her appearance in the trial, Ms. McChord demonstrated exemplary courtesy and concern for her clients.
[4] Construction of the procedural history of the case has been hampered by DCFs social studies, which omit certain events and CT Page 4046 contain inaccurate dates concerning others. In addition, the DCF worker who handled the case from December, 1996 to March, 1998 was not available to testify because, apparently, she had left DCF service and moved out of state. Finally, the respondent mother submitted several voluminous documentary exhibits but, contrary to the courts request, did not point out the salient portions of these exhibits in her posttrial brief, necessitating the courts unassisted review of them. Ordinarily, a party may not introduce such an "indiscriminate mass of material." Drabik v.East Lyme, 234 Conn. 390, 399 (1995).
[5] Some DCF documents spell her first name as "Catherine."
[6] Thomas was not present for the 1995 evaluation. The mother failed to attend the 1995 and 1996 evaluations.
[7] Unfortunately, at the time of trial DCF could not locate and produce many of the contemporaneous narrative entries for these home visits.
[8] At some point during this time period, DCF also learned that New York State had a warrant for Tyrones arrest.
[9] Tyrone disclosed his prior addiction to cocaine at a psychiatric evaluation in December, 1996. There was no specific evidence concerning whether he had previously disclosed this fact to the mother. The psychiatrist did not learn of Tyrone's prior convictions.
[10] Much of the information in this section comes from an exhibit entitled "Report Resulting from the Death of Reagan M.," which was written by the Office of the Child Advocate.
[11] A DCF supervisor testified that, while the foster mother yelled at Anthony, he was not physically abused at the foster home. A July 9, 1997 DCF psychiatric assessment, however, reported Anthony's claims that the foster parents did abuse him physically while disciplining him.
[12] Unfortunately, DCF did not readily cooperate in providing records to the placement agency. to his foster mother and would like to stay there.
[13] The court need not make such a finding, however, "if a CT Page 4047 court has determined at a hearing pursuant to subsection (b) of section 17a-110 [dealing with permanency planning for committed children] that such efforts are not appropriate." Id. No such finding was made in this case.
[14] All statutory references are to the 1997 revision of the Connecticut General Statutes.
[15] All of the therapists and social workers who testified about the matter concurred that, while the experience at the Village was clearly damaging to Thomas and Anthony, the boys turbulent upbringing in the mothers home also played a significant role in their psychological development. Thomas, in particular, had a psychiatric history before he went into foster care. As stated, Dr. Mantell found that all of the children, except for Frederick, were at risk for a variety of psychological problems based on evaluations conducted in 1994, 1995, and 1996.
[16] This deferment does not, of course, affect the courts adjudication of statutory grounds to terminate for Brittany and Shaquanna.