Memorandum of Decision
On March 17, 1999, the Department of Children and Families (DCF) filed a petition to terminate the parental rights of Donald B. and Jill P. to their minor daughter, Shanice P. On July 15, 1999, the mother, Jill P., consented to termination conditioned on the court's granting of the termination petition against the father. A trial of the petition against the father, Donald B., CT Page 968 took place in this court on January 6 and 7, 2000. For the reasons stated below, the court flow grants the termination petition in its entirety.
FACTS
The court finds the following facts and credits the following evidence. The father was thirty-three years old at the time of trial. He became involved in criminal activity as a youth and dropped out of school at age sixteen. In his late teens, he became a father to a boy, Donald B., Jr., through a nonmarital relationship. The boy is now living with his mother in North Carolina.
The father remained involved with the criminal justice system during his twenties and early thirties. In the mid-1990's, the father began a relationship with Jill P. Jill had a son, Dillon P., from another nonmarital relationship. The relationship between Donald B. and Jill P. was marred by domestic violence and drug abuse. In January, 1997, a court imposed a no contact protective order against the father. DCF became involved with the family at this time.
Shanice was born to the couple on April 16, 1997. In the next six weeks, the father spent a fair amount of time taking care of Shanice, although his contact with the mother was in "violation of the protective order. The father's physical abuse of the mother persisted. DCF placed the mother in two different shelters, but the mother refused to stay.
In late May, 1997, as a result of these events, DCF obtained an order of temporary custody for Shanice and Dillon. DCF placed them in the foster home of Robert and Georgia R. DCF offered the parents weekly visitation at a DCF office, with the mother having the additional opportunity to visit the children once a week at the foster home. The parties arrived late for the first visit and the father did not actively participate. The father failed to attend the second visit, according to him because he was sick, and failed to attend a third visit. As a result, on June 18, 1997, DCF advised the father that he would have to contact their agency before it would grant him further visitation. The father also failed to attend any of the court hearings in the early stage of the case. The father, accompanied by the mother, did visit Shanice twice at the foster home without DCF permission.
CT Page 969 The mother told DCF that she was not sure that Donald B. was Shanice's father. The father himself was not sure. DCF accordingly advised the father, on June 24, 1997, that he would have to take a paternity test before visitation could resume. The father failed to take a test at that time. In September, 1997, the father called the DCF case worker to inform her that he was not Shanice's father, that his relationship with the mother was over, and that DCF should stop sending him correspondence.
On October 27, 1997, the father was arrested for third degree assault, violation of a protective order, and two counts of risk of injury to minors. He remained in jail on these and other pending charges. On March 25, 1998, the court imposed a net effective sentence of five years in prison for sale of narcotics, violation of a protective order, and two counts of third degree assault.[2] These convictions gave the father a total of eighteen since 1982, including four felony convictions. The father's maximum release date is October 24, 2002, although the father will be seeking an earlier release to a halfway house or on parole.
For the next seven months, the father did not attend court or request visitation with Shanice. On May 28, 1998, the court granted DCF's motion for a paternity test. The test results, obtained in July, 1998, confirmed that, in all probability, Donald B. was the father of Shanice.
The father then spoke to DCF and stated that he would like to become part of Shanice's life. He offered his mother, Deborah E., as a placement for Shanice until he got out of prison. The father asked for visitation with Shanice and, in August, 1998, DCF requested a psychological evaluation to assess this request. The father sent Shanice cards, letters, and presents for Christmas, 1998.
The psychological evaluation took place in September, 1998. The evaluator recommended against visitation with the father, primarily because the father had no existing relationship with Shanice. DCF adopted this recommendation and included it in treatment plans in April and October, 1999. The father did not challenge these treatment plans.
The father testified at trial. He has completed anger management and Tier II substance abuse programs in prison. He is attending Alcohol Anonymous meetings and is on the waiting list CT Page 970 for several other prison programs.[3] He also has two recent disciplinary tickets for fighting with inmates. He acknowledges making mistakes in the past and has become more religious.[4]
The father admitted that he does not currently have a relationship with his daughter. He testified that he did not realistically hope to take Shanice away from her current placement but rather just sought to have visitation rights or remain a part of her life in some way. He offered as a possible placement his own mother, who testified sincerely that she and her husband are willing to serve as a placement resource for both Shanice and Dillon. With the cooperation of the foster mother, the paternal grandmother has visited Shanice recently and given her gifts. The paternal grandmother, who generously volunteers her time at church and in hospitals, would like Shanice to know her father's side of the family as she grows up.[5]
Shanice has remained in the foster home of Robert and Georgia R. since her placement on May 29, 1997. Although she was exposed to crack cocaine and marijuana in utero, Shanice is developmentally on target. She has no positive memories of or feelings towards her natural father. When Shanice saw the father at the September, 1998 psychological evaluation, she exhibited "stranger anxiety."
Shanice calls her foster parents "Mom" and "Dad." Shanice can use sign language to communicate with the foster father, who has a hearing impairment. She is attached to her foster parents as well as to her natural brother Dillon, who has been with her in the foster home for the entire time, and to the eight and seven year old biological sons of the foster parents. The foster parents did not originally intend to adopt Shanice, but over the years their attachment to her has led them to that decision. They also hope to adopt Dillon, whose natural parents have consented to termination.
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child "with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." CT Page 971 General Statutes § 17a-112 (c(1). The court, however, need not make a reasonable efforts finding "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b [dealing with permanency planning for committed children] that such efforts are not appropriate." General Statutes § 17a-112(c)(1). In this case, the court found on September 14, 1999, at a hearing concerning extension of the commitment, that reasonable efforts to reunify the children were not appropriate. Accordingly, this element has been satisfied.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919, 722 A.2d 807 (1998); General Statutes § 17a-112(c)(3). In this adjudicatory phase, the court is ordinarily limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a).
There being no amendments to the petition concerning the father, the adjudicatory date in this case is March 17, 1999, when DCF filed the termination petition. The petition against the father alleges the grounds of abandonment and lack of an ongoing parent-child relationship. The court finds that DCF has proven these grounds by clear and convincing evidence.
1. Abandonment
General Statutes § 17a-112(c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of "interest, concern or responsibility' for the welfare of the child." In re Migdalia M.,6 Conn. App. 194, 208-209, 504 A.2d 533, cert. denied,199 Conn. 809, 508 A.2d 770 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id, 209. The statutory term "maintain" implies a continuing, reasonable degree of concern." Id., 210. CT Page 972
The father spent a fair amount of time with Shanice during her first month of life. Once Shanice went into foster care, however, the father visited her only once with DCF authorization "and twice without. DCF gave the father the opportunity to visit regularly, by initially contacting them and later by taking a paternity test, but the father failed to take advantage of this opportunity. In September, 1997, the father went so far as to call DCF to deny paternity and ask that DCF stop sending him correspondence.
Although the father went to prison in October, 1997, incarceration alone is neither a complete defense to nor sufficient proof of abandonment. See In re Juvenile Appeal(Docket No. 10155,) 187 Conn. 431, 443, 446 A.2d 808 (1982). While in prison, the father failed to request visitation or take a paternity test until the court ordered a test in May, 1998. After the father learned the results of the test in July, 1998, the father did make some attempts to reestablish contact with his daughter. By that time, however, he had abandoned her for over a year. The father thus did not "maintain" the requisite "continuing, reasonable degree of concern" for his child. In reMigdalia M., supra, 6 Conn. App. 210. DCF has accordingly proven by clear and convincing evidence that the father abandoned Shanice during the adjudicatory period.
2. No Ongoing Relationship
The second statutory ground alleged in this case is that there is "no ongoing parent-child relationship, which means the relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." General Statutes § 17a-112(c)(3)(D). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re Juvenile Appeal(Anonymous), 181 Conn. 638, 645, 436 A.2d 290 (1980) (internal citation omitted). "In either case the ultimate question is whether the child has no present memories or feelings for the natural parent." Id., 646. CT Page 973
In the present case, the evidence is undisputed that Shanice has no positive memories of or feelings for her father. The father admitted that he has no relationship with her. Allowing further time to develop a parent-child relationship would clearly be contrary to Shanice's best interest because she has been in foster care for two years, she has already bonded with her foster parents, and the father's release from prison is not imminent. The court accordingly finds that DCF has proven the ground of no ongoing parent-child relationship by clear and convincing evidence.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." General Statutes § 17a-112(c)(2). The court can consider all events occurring through the close of the dispositional hearing. See Practice Book § 33-5.
The best interest of Shanice clearly and convincingly requires termination of the parental rights of her biological parents. The mother has consented to termination. The father abandoned his daughter for over a year and now is essentially a stranger to her. Although the father has taken steps inside the prison to turn his life around, being a good citizen outside of prison is a different undertaking. The father's track record in that regard is not good. The father, in any event, remains in prison at this time and his release before October, 2002 is uncertain at best.
Shanice is strongly attached to her foster family, with whom she has lived almost her entire life. One of the members of that family is her half-brother Dillon, whom the foster parents plan to adopt. Terminating the father's rights to Shanice would allow the foster parents to adopt Shanice and keep her together with Dillon.
The only way that the court could grant the father the visitation rights he seeks would be to deny the termination petition. This the court will not do, because such an action would prevent the foster parents from adopting Shanice and deprive her of the permanency to which she is entitled. The court does not have the authority to award the father visitation once it grants the termination petition. Visitation in that instance CT Page 974 will be up to the foster parents. The court would suggest, however, that the foster parents look favorably upon permitting visitation by the paternal grandmother, since she would provide Shanice an excellent role model from the father's side of her natural family. In general, this court is "not prepared to assume that the welfare of children is best served by a narrow definition of those whom [it] permit[s] to continue to manifest their deep concern for [their] child[ren]'s growth and development." Michaud v. Wawruck, 209 Conn. 407, 415,551 A.2d 738 (1988).
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112 (e). See In re Tabitha P.,39 Conn. App. 353, 362, 664 A.2d 1168 (1995). These factors serve only to guide this court in making the ultimate decision whether to grant the termination petition, and no one factor is a prerequisite. See In re Eden F., 250 Conn. 674, 691, ___ A.2d ___ (1999). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and "child by an agency to facilitate the reunion of the child with the parent.
As stated above, DCF originally offered the father visitation and requested that he take a paternity test. The father failed to cooperate. He then went to prison, where DCF cannot realistically provide services except for visitation. Once testing established the father's paternity, DCF reasonably sought the opinion of a psychologist, who recommended against visitation. DCF reasonably followed this recommendation.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF made reasonable efforts to reunite the father with Shanice before he went to prison and that, even though the father went to prison with a five year sentence in October 27, 1997, DCF withheld filing for termination against the father until March, 1999, thus allowing additional time for possible family reunification.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the CT Page 975 extent to which all parties have fulfilled their obligations under such order.
There is no evidence of any court-ordered expectations concerning the father, apparently because the father was in jail on October 31, 1997, when the court adjudicated Shanice neglected.
4) The feelings and emotional ties of the child with respect to his parents, any guardian "of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Shanice is strongly attached to her foster parents and has no ties to her natural father.
5) The age of the child.
Shanice will be three years old on April 16, 2000.
6) The efforts the parent has made to adjust his circumstances or conditions to make it "in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that the father did not adjust his circumstances in time to make it in Shanice's best interest to return to his home or to be reunited with him. The father's contact with Shanice, DCF, and the foster parents was very limited.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As discussed above, the father's difficulties stem primarily from his own lifestyle choices and not from unreasonable CT Page 976 interference by other persons or by economic circumstances.
CONCLUSION
Based upon the foregoing findings, the court hereby grants the termination petition in its entirety. The Commissioner of DCF is appointed statutory parent for Shanice for the purpose of securing an adoptive family. It is the court's opinion that the current foster family should be allowed to adopt Shanice. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
Carl J. Schuman, Judge, Superior Court